**E.D. HAYDEN**

v.

**TEXAS–U.S. CHEMICAL CO.**

Civ. A. No. B–79–286–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

Feb. 16, 1983.

Ned Johnson, Guy N. Goodson, Benckenstein, McNicholas, Oxford, Radford & Johnson, Beaumont, Tex., for plaintiff.

Joseph R. Weeks, Baker & Botts, Houston, Tex., for defendant.

## MEMORANDUM OPINION

JOE J. FISHER, District Judge.

E.D. Hayden sued his former employer, Texas-U.S. Chemical Company, on his claim for benefits under the company's Permanent and Total Disability Plan ("the Plan"). Following a trial before the court on December 15, 1980, judgment was entered for Hayden May 27, 1981 in the amount of $30,463.20.

Texas-U.S. appealed the decision to the Court of Appeals for the Fifth Circuit on June 22, 1981, and the Court of Appeals rendered a decision on August 6, 1982. The court vacated the judgment below and remanded the case for further consideration by the district court. The Court of Appeals could not discern the basis for the judgment in the findings of fact and conclusions of law prepared by the district court. *Hayden v. Texas-U.S. Chemical Co.*, 681 F.2d 1053 (5th Cir.1982).

This court reopened the proceedings in order to reconsider Hayden's claim. The parties argued at a hearing that no additional evidence was required. They urged the court to reconsider the original record, briefs and depositions already filed, and supplemental briefs to be filed. The court has done so. Its findings and conclusions follow.

Hayden went to work for Texas-U.S. in 1967. Company physicians objected to his being hired on the basis of preemployment physical examinations which revealed an abnormality in Hayden's lower back vertebral structure. The doctors believed Hayden was predisposed to serious injury if he did hard labor. Nonetheless, Texas-U.S. hired Hayden to work as a laborer at its Port Neches rubber plant.

During his work for Texas-U.S., Hayden sustained injuries to his lower back. His condition deteriorated into lumbar disc syndrome, aggravated by secondary arthritis. Hayden declined however, to undergo the corrective surgery recommended by company and personal physicians. He feared that the operation would leave him worse off than before.

Texas-U.S. laid off Hayden in January, 1975 during a reduction in force. Hayden received unemployment benefits thereafter and worked for a time in Baton Rouge and Houston.

In April, 1975 Hayden sought emergency room treatment for his back. He underwent the first of a series of operations on his back in May. At that time, he was still in "layoff" status with Texas-U.S.

Shortly thereafter, Hayden and his cohorts were recalled from "layoff" status and ordered to return to work. After Hayden notified Texas-U.S. of his surgery, the company changed his employment status to "medical leave of absence." Hayden underwent two more operations to his back, but never returned to work.

Hayden remained on the Texas-U.S. employee rolls until June, 1978. Texas-U.S. discharged him at that time. The decision was based on its opinion that, because of his back problems, he could not return to work.

After his discharge, Hayden applied for benefits under the Plan. The administrators of the Plan denied Hayden's claim for benefits. They claimed he was ineligible because his disability arose while Hayden was in "layoff" rather than "active" status.[1]

The administrator further concluded that Hayden's disability was of "indeterminate" rather than "permanent" duration. Hayden's failure to show a "permanent" disability made him ineligible for Plan benefits, Texas-U.S. claimed.

---

1. Under the subtitle "Termination or Suspension of Benefits," the Plan brochure states that: "The benefits payable to you under [the Plan] may be suspended or terminated for any of the following reasons:

   (1) employee disability resulting from misconduct;

   (2) employee disability commencing while in Military Service or Layoff;

   (3) determination by the company that it was mistaken in its previous determination that the employee was disabled;

   (4) employee attains age 65;

   (5) death of employee (subject to the minimum number of payments to your beneficiary). All benefits under this Plan are paid from the general assets of the company."

Hayden complained that Texas-U.S. breached its contract of employment and collective bargaining agreement by denying him benefits. He further alleged violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* (1976), ("ERISA").

Texas-U.S. insisted that the Plan neither created nor expressed any contractual rights or duties. The payment of benefits was therefore entirely discretionary, it maintained.[2] Texas-U.S. relied on Texas court decisions holding "benevolent claims" legally unenforceable when the contractual provisions expressly denied contract liability.

The Plan delegated sole authority to determine eligibility for benefits in Texas-U.S.[3] Relying on the limited regulation by Texas law of employee benefit plans, Texas-U.S. maintained that its determination of benefit eligibility was "not subject to attack in the courts in the absence of a showing of fraud or bad faith." *Long v. Southwestern Bell Telephone Co.,* 442 S.W.2d 462, 464 (Tex.Civ.App.—San Antonio 1969, writ ref'd n.r.e.).

Texas-U.S. vigorously opposed Hayden's assertion of a federal ground for relief. Hayden did not raise an ERISA claim until the day of trial. The Texas-U.S. defense depended primarily on the deference that Texas law gives to private employment agreements.

■ The parties addressed the ERISA issues in their supplemental briefs. Texas-U.S. now concedes that ERISA does apply to the Plan. (Its earlier insistence that ERISA did not govern the Plan appears disingenuous given the prominent "Statement of ERISA Rights" in the Plan handbook distributed to Texas-U.S. employees.)

Having reviewed the record and the briefs filed by the parties, the court believes that the Plan must be applied and interpreted consistently with ERISA. The court finds that the Plan is an "employee welfare benefit plan" as defined in ERISA.[4] The Plan is not exempt from the provisions of ERISA since it does not meet any of the coverage exemption conditions.[5] The court concludes, therefore, that the Plan is governed by ERISA.

■ This conclusion requires the court to disregard Texas law. This is so because ERISA, if applicable, displaces otherwise governing state law. *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1980).[6]

■ Moreover, ERISA has been held to authorize the development of a federal common law concerning employee benefit plans. *Woodfork v. Marine Cooks & Stewards Union,* 642 F.2d 966, 972–73 (5th Cir.1981). This power extends to the interpretation of a worker's pre-ERISA state law rights. A worker may raise these rights "as part of a judicially created body of federal law governing pension entitlement." *Id.*

2. Article V, ¶ 3 of the Plan provides: This Plan is entirely voluntary on the part of the Company. An employee acquires neither a vested nor a contractual right hereunder, nor a right to be retained in the service of the company. This Plan is not underwritten by any insurance company and may be terminated or modified by the Company at any time without notice and without liability to anyone.

3. Article II, ¶ 3 of the Plan provides: The Company alone shall determine what constitutes Permanent and Total Disability, when the same commenced, and may at any time reverse or alter any such determination.

4. "Employee welfare benefit plan" is defined as "any plan ... maintained by an employer ... for the purpose of providing [*inter alia*] ... benefits in the event of sickness, accident, dis-

ability, death, or unemployment ... 29 U.S.C. § 1002(1)(A) (1976).

5. ERISA specifies that its provisions shall not apply to any employee benefit plan if the plan is:
   (1) a governmental plan;
   (2) a church plan;
   (3) maintained solely to comply with workmen's or disability compensation laws;
   (4) maintained outside the U.S. primarily for the benefit of nonresident aliens;
   (5) an excess benefit plan and is unfunded. 29 U.S.C. § 1003(b) (1976).

6. ERISA specifically provides that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described ... [herein] ... and not exempt ..." 29 U.S.C. § 1144(a) (1976).

■ Although ERISA governs the Plan, it applies to Hayden's claim only if his cause of action arose after January 1, 1975. 29 U.S.C. § 1144(b) (1976). A claim may lie under ERISA however, even though it is founded in part on earlier occurrences. *Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 970 (5th Cir.1981).

Such is the case of Hayden. His cause of action against Texas-U.S. arose in February, 1979 when it denied his eligibility for benefits under the Plan. *See, e.g., Paris v. Profit Sharing Plan, etc.*, 637 F.2d 357, 361 (5th Cir.1981). Hayden's disability is "founded on earlier occurrences," i.e., injuries extending back over the term of his employment with Texas-U.S. The Plan, as well, pre-dates ERISA; and to that extent, his cause of action has roots in pre-ERISA agreements. In spite of those connections, Hayden's claim is now governed by ERISA. *Id.*

■ Having determined that the Plan is governed by federal law, the court must apply any germane statutory provisions of ERISA.

The evidence indicates that Texas-U.S. did not operate the Plan in strict accord with the claims procedure set forth in 29 U.S.C. § 1133. The Plan is required to "provide adequate notice in writing to any recipient or beneficiary whose claim for benefits has been denied ..." The notice must set forth specific reasons for denial. Moreover, the denial must be written so that the workman can understand it. *Id.*, at (1).

Texas-U.S. wrote to Hayden through his attorney on February 26, 1979. The letter stated that Hayden was neither entitled to benefits, permanently and totally disabled, nor otherwise eligible.[7]

The court finds that Texas-U.S. did not give Hayden "specific reasons" for the denial of benefits. The notice was not "written in a manner calculated to be understood by the participant." *Id.*

Moreover, the notice of denial was inadequate by virtue of the tardiness of Texas-U.S. in informing Hayden of its decision. He had advised the Company of his desire to apply for disability benefits on August 4, 1978. Hayden filed the necessary documents shortly after receiving them. The determination of his ineligibility for benefits was not made until almost seven months after his initial request. The letter of denial came only upon the prodding of Texas-U.S. by Hayden's attorney.

■ The record shows that Texas-U.S. also failed to afford to Hayden a reasonable opportunity for a full and fair review by the appropriate fiduciary as required by statute. *Id.*, at (2).

■ Because Texas-U.S. failed to meet its obligations with respect to Hayden's claim, he had to seek relief in the court as provided for in 29 U.S.C. § 1132(a)(1)(B) (1976).

No statutory provisions appear to directly govern Hayden's complaint that Texas-U.S. breached his employment and collective bargaining contracts. The court must, therefore, "acquit its obligation to develop and apply federal common law consonant with the objectives established by ... [ERISA] ..." *Hayden v. Texas-U.S. Chemical Co.*, 681 F.2d 1053, 1058 (5th Cir.1982).

In order to apply federal common law in this case, the court must first determine the correct interpretation of the Plan. Then the court must determine whether the administrators of the Plan acted arbitrarily or capriciously in denying Hayden benefits under the Plan. *Dennard v. Richards Group, Inc.*, 681 F.2d 306 (5th Cir.1982).

■ The threshold question is whether Hayden is permanently and totally disabled.

---

7. The pertinent part of the letter said:

"You are advised that in accordance with the terms of [the Plan] and in particular with the provisions of Article II, Benefits, C., Termination or Suspension of Benefits, (b), Mr. Hayden is not entitled to any benefits under the terms of the plan. You are further advised that the Company does not agree that Mr. Hayden is permanently and totally disabled or that Mr. Hayden is otherwise eligible as required by Article II, Eligibility, A., Persons Eligible, 1., of the plan."

A negative answer forecloses further inquiry, since Hayden would be entitled to no benefits under the Plan regardless of any bad faith on the part of Texas-U.S.

The court is persuaded by the overwhelming weight of the evidence that Hayden is permanently and totally disabled. The medical records, including reports of physicians retained by Texas-U.S., support this finding. Hayden's final dismissal by Texas-U.S. for medical reasons further supports the finding of the court. The Texas-U.S. supervisor who recommended his dismissal testified that Hayden "was terminated due to inability to return to work from leave of absence based upon medical evaluation ... I would say," he added, "he was physically disabled from working."

The critical question insofar as the Plan is concerned however, is 'when did Hayden become disabled?' This is so because, as noted above, the Plan denies disability benefits when the disability commences while the employee is in "layoff" status.

It is apparent that Hayden was disabled when finally terminated by Texas-U.S. in June, 1978. Although Hayden's pre-employment physical examination in 1967 showed a defect in his back which made him susceptible to later back injury, the fact that Hayden worked as a laborer for several years thereafter shows that Hayden was not disabled when hired. His disability arose, therefore, at some point in the eleven year period during which he was an employee of Texas-U.S. either: in working status, in "layoff" (idle or employed elsewhere), or on medical leave of absence.

The court finds from a preponderance of the evidence that Hayden became disabled to perform his normal work at Texas-U.S. before he was put on "layoff" status. The court further finds that Hayden became permanently disabled from performing any work for Texas-U.S. following his recuperation from corrective surgery while he was on the medical leave of absence that began in 1975.

As to the initial disability of Hayden, the court notes that the x-ray films made for Texas-U.S. show that Hayden had a severe rotation of his fifth lumbar vertebral body which made later injury likely. In October, 1970, Hayden injured his back at work. Dr. Hamby, the Texas-U.S. physician, advised that Hayden not be given strenuous work to do. His back pain persisted even as he returned to work.

By 1972, his pain increased enough to require treatment. Hayden's physician, Dr. Glass, diagnosed a herniated, ruptured disc, and recommended surgery. On behalf of Texas-U.S., Doctors Starr and Thomas examined Hayden. The former diagnosed a questionable ruptured disc and the latter, lumbar disc syndrome. Hayden continued to work.

In April, 1974, Dr. Kuhlman interpreted current x-ray films of Hayden. He reported to Texas-U.S. that Hayden was less fit for employment than he had been originally. The doctor noted secondary arthritis in addition to the vertebral defect.

Six months later, Hayden strained his back and was briefly hospitalized. He remained off work from early October until early December, 1974. Texas-U.S. paid him sickness and accident benefits.

Dr. Banski examined Hayden for Texas-U.S. and recommended that he not return to his previous work. When Hayden returned to work on December 10, 1974, he could not do his old job of carrying bales of rubber. Instead, Texas-U.S. assigned Hayden to light duty work as a janitor.

When "laid-off" one month later, Hayden was still doing light duty work. The court believes that Hayden was then disabled, at least as to his former job.

In the months that followed the layoff, Hayden worked for two contractors, two or three weeks for each. There is no evidence to suggest that Hayden suffered any injury to his back or that he did any strenuous work while he was in "layoff" status with Texas-U.S.

Hayden sought hospital treatment for a flare-up in back pain in April, 1975. He finally consented to surgery in May. His doctor had advised surgery as early as May,

1972, but Hayden had declined lest his condition be worsened. In May, 1975 Dr. Starr did the first of two operations on Hayden's back. Hayden's pain persisted. The doctor operated again about two months later.

On June 16, 1975, between the time of the two operations, Texas-U.S. recalled the "laid-off" workers. Because he was still recuperating from surgery, Hayden was put on medical leave of absence status. After Hayden's recovery from the surgery, he could not return to work. He had a third operation in December, 1977.

When Hayden sought to return to work, Texas-U.S. had its medical director, Dr. Hamby, examine him. Based on Dr. Hamby's examination and the medical reports of Hayden's doctors, Texas-U.S. terminated Hayden for medical reasons on June 6, 1978.

It is impossible to say to a certainty the exact time when Hayden became disabled. He did not experience a sudden, traumatic injury. Rather, he suffered from an erratic deterioration of his back that finally left him unable to work.

Although Hayden had a defect in his back when he went to work for Texas-U.S., he was able to do heavy labor for over seven years. Hayden strained his back several times and missed work occasionally. His final strain disabled him for two months. He could not undertake his previous duties thereafter. Hayden's later treatments were not successful.

As a result of the series of strains he suffered while a Texas-U.S. employee, Hayden finally became disabled to the point that the company determined he would not be able to return to work, that he was "physically disabled from working."

Texas-U.S. insists that Hayden's disability commenced at the time of his back surgery when he was on "layoff." The court cannot agree. Hayden underwent surgery in order to remove the disability. To maintain that the disability began with the treatment of the disability is to urge nonsense.

Hayden's disability commenced when he first strained his back at Texas-U.S. It became manifest when he was hospitalized and later assigned to light duty. The disability finally became permanent and total following Hayden's recuperation from the unsuccessful series of operations.

■ Having found that Hayden's disability commenced while he was an eligible employee of Texas-U.S., the court concludes that the plain language of the Plan requires that he be paid benefits thereunder.

Texas-U.S. claims the contrary: that the plain language of the Plan makes any payment voluntary. It further denies that an employee has any enforceable rights in the Plan.[8] That position is untenable. The Plan cannot be both a bargained for element of the employees' compensation package and not binding on Texas-U.S. If the Plan is voluntary in the sense that Texas-U.S. urges, why was it included in the collective bargaining agreement? If the Plan were simply a gratuitous gesture, Texas-U.S. would have taken full credit for its act of corporate largesse, and denied that the union had any responsibility for the existence of the employee benefit program.

Texas-U.S. argues that it would never have agreed to provide the Plan without the "voluntary" provision. That is, it agreed to maintain the Plan only on the condition that it could cease to maintain the Plan at any time. The court has difficulty with that assertion simply as a logical proposition; considering the economic reality of the collective bargaining process, as well, the court does not find the Texas-U.S. position to be tenable.

In the memorandum agreements that amend the collective bargaining agreement, the contractual obligation of Texas-U.S. is specified unequivocally: "The Employee Benefits Program shall remain in effect for five years from the date of this memorandum agreement." Later agreements extend the term of the contract.

As used in the Plan, "voluntary" means not that Texas-U.S. can refuse to make

8. See note 2 above.

payments at its whim. "Voluntary" means that Texas-U.S. is not bound by contract to provide the Plan as part of a later collective bargaining agreement. The employee benefit plan will remain a bargaining chip, subject to negotiation, at the next contract session.

The same interpretation applies to the provision that an employee acquires neither a vested nor a contractual right thereunder. Although Texas-U.S. is bound to honor the plan during the life of the current collective bargaining agreement, the contract does not require Texas-U.S. to renew the Plan thereafter.[9]

The court makes this interpretation of the Plan on the well-settled rule of law that "a writing is interpreted as a whole, and all writings a part of the same transaction are interpreted together." RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981). The memorandum agreements specify the duration of the employee benefit program. The ostensibly ambiguous terms in the Plan itself will not refute the clear wording of the main agreement.

In choosing this interpretation, the court believes that it gives a reasonable, lawful, and effective meaning to all the terms, in favor of one which leaves a part unreasonable or to no effect. *Id.,* at § 203(a). Moreover, the court prefers that meaning which operates against the party which supplied the words. *Id.,* at § 206. Texas-U.S. drafted the Plan provisions. It may not enforce the ambiguity of its chosen language to the detriment of the other party to the contract.

The court concludes that an employee does have certain contractual rights by virtue of the Plan. No employee can force Texas-U.S. to renew the Plan as a matter of right. But while the Plan is in effect, i.e., part of the collective bargaining

agreement between Texas-U.S. and its employees, an employee can enforce the Plan against Texas-U.S.

Given the court's interpretation of the Plan as a contract binding on Texas-U.S., the court perceives no reason to further review the actions of the Plan administrators once a breach is established. What remains is nothing more than a simple contract question.

The Court of Appeals for the Fifth Circuit has held however, that "the clear weight of federal authority" is to the contrary. "Determinations of eligibility [for pension benefits] are to be upheld unless arbitrary and capricious." *Paris v. Profit Sharing Plan, etc.,* 637 F.2d 357, 362 (5th Cir.1981).

Citing other circuits as authority, the court decided that the actions of pension plan trustees "must be sustained as a matter of law unless plaintiff can prove such activities have been arbitrary or capricious." *Bayles v. Central States, Southeast, etc.,* 602 F.2d 97, 99 (5th Cir.1979).

That holding perplexes this court. It allows an employer to breach his employees' compensation contract with impunity, so long as the employer does not do so in an "arbitrary or capricious" manner. The administrator may be stupid, or simply ignorant, or ill-advised on the meaning of the contract. No matter. He may breach and breach again, yet the employee cannot enforce his rights.

With the social security retirement system in a shambles and its bankruptcy imminent, private benefit plans offer most workers their only hope of security in old age or disability. To an older worker, his pension rights may be more valuable than his salary. He can enforce those valued rights however, if and only if he can prove the

---

9. It appears to the court that Texas-U.S. is bound by its contract to honor the payment obligations created by the Plan that accrue under the current contract, even if the Plan is not included in a later collective bargaining agreement. That is, if the Plan provides for disabili-

ty payments based on seniority of 25% of base pay until normal retirement age, Texas-U.S. is bound by the contract to pay those benefits to an employee until he reaches that age, regardless of the inclusion or deletion of the Plan in the next collective bargaining agreement.

contract's breach to be "arbitrary and capricious." This is an absurd requirement.[10]

The court believes that disputes over employment contracts—including pension and disability benefit plans—are most rationally, economically, and equitably resolved by the application of traditional contract principles. It is, after all, a contract that the court is being asked to interpret.

By injecting the nebulous terms "arbitrary and capricious" into the analysis of contracts, the court retards the rational resolution of disputes. Basic contract concepts and terms do not, of course, convey absolutely precise meaning. But they carry substantially more meaning than the slippery concept of "arbitrary and capricious." Requiring that "standard" of review makes for a paucity of legal analysis. It substitutes conclusory phrases for specific supporting factual determinations.

Despite its disagreement with "the clear weight of federal authority," the court must review the actions of the plan administrators as required by that authority.

■ In reviewing the actions of the administrators of the Plan, the court notes their failure to faithfully comply with the ERISA notice and appeal requirements. The slothlike response to Hayden's initial request for benefits is noteworthy. So also is the claim of Texas-U.S. that Hayden did not provide adequate medical certification of his disability. The Texas-U.S. files hold ample reports to that effect. Moreover, in his letter the administrator denied that Hayden was permanently and totally disabled, but admitted later that he recommended Hayden's termination because of his belief that Hayden was physically disabled from working.

It is the conclusion of the court that those actions were arbitrary and capricious. The Plan administrators did not act in good faith in deciding the claim of Hayden for disability benefits.

Texas-U.S. argues that this conclusion is unjustified inasmuch as the Plan vests all decision-making power as to eligibility in Texas-U.S.[11] This reservation of power by Texas-U.S. does not inhibit a finding that its interpretation is arbitrary and capricious. *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 317–18 (5th Cir.1982). Indeed, the very words of the reservation of power suggest the possibility of arbitrary decisions or revocations of eligibility by the company.

In any event, the specific language of the Plan is a major consideration in reviewing the acts of the Plan's administrators for arbitrary or capricious acts or lack of good faith. *Id.,* at 316.

■ Texas-U.S. will not be heard to deny the fact of Hayden's disability for purposes of the Plan after firing him because of his physical inability to work.

The claim of Texas-U.S. that the Plan is strictly voluntary would also let the defendant have it both ways. It calls the Plan a "bargained for" part of its collective bargaining contract, yet Texas-U.S. also claims the right to dishonor the Plan at any time.

Moreover, the Plan's disclaimer of contract rights is the kind of equivocation that ERISA seeks to remove from employee benefit programs. The Plan purports to give the employees of Texas-U.S. certain benefits and rights when they become disabled. Yet by another clause in the Plan, Texas-U.S. would negate the enforceability of those rights. The ambiguity in the contract will be interpreted against the party which drafted it.

For the reasons described above, the court concludes that Texas-U.S. violated Hayden's ERISA and common law rights in denying him benefits. The Plan administrators' actions were arbitrary and capricious and not taken in good faith.

---

10. The court understands that the "arbitrary and capricious" standard of review is meant to discourage frivolous lawsuits and further burdens on the judicial system. Naturally, this court dislikes frivolous litigation, but it has not forgotten that its primary function is to equitably resolve disputes and enforce the rights of litigants.

11. See note 3, above.

The court further concludes that enforceable contract rights are created by the Plan as a part of the collective bargaining agreement. The payment of benefits under the Plan therefore is not voluntary so long as the collective bargaining agreement is in effect when the disability arises.

■ The court finds that Hayden became permanently and totally disabled while an employee of Texas-U.S. Since his disability did not commence during a "layoff," he is entitled to be paid benefits. The plain provisions of the Plan require it.

The court concludes that Hayden is entitled, pursuant to 29 U.S.C. § 1132(g)(1), to a reasonable attorneys' fee and costs. Accordingly, the court hereby awards attorneys' fees and costs to Hayden as set out below.

The court enters judgment for the plaintiff, E.D. Hayden, and against the defendant, Texas-U.S. Chemical Co., in the amount of Thirty Thousand Four Hundred Sixty Three and 20/100 Dollars ($30,463.20). If an appeal is prosecuted by the Defendant, additional reasonable attorneys' fees will be awarded for the previous as well as subsequent appeals.

As noted above, the court reopened the proceedings in this cause only to the extent of a hearing at which the parties presented no additional evidence and but little argument. The mandated "reconsideration" of Hayden's claim, articulated in this memorandum opinion, consisted entirely of this court's making explicit the basis for its judgment, implicit in the findings of fact and conclusions of law originally entered.

The judgment entered today in no way differs from the original. This judgment is predicated on the same law and evidence as the original. It stands on precisely the same factual and legal analysis. Inasmuch as the court this day effectively reenters judgment for the Plaintiff, a judgment identical to that entered May 26, 1981, the court awards to the Plaintiff post-judgment interest from the original date of the judgment at the rate of nine percent (9%) per annum.