**John POKRATZ, Plaintiff,**

**v.**

**JONES DAIRY FARM and Jones Dairy Farm, Plan Administrator of the Jones Dairy Farm Union Employees' Pension Plan, Defendants.**

**No. 84–C–217–S.**

United States District Court,
W.D. Wisconsin.

Nov. 14, 1984.

Kenneth R. Loebel, Habush, Habush & Davis, Milwaukee, Wis., for plaintiff.

Michael H. Auen, Foley & Lardner, Madison, Wis., Richard E. Hemming, Consigny, Andrews, Hemming & Grant, Janesville, Wis., for defendants.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Before the Court in this action is the record of plaintiff's application for disability benefits from the retirement and disability plan offered by his employer, Jones Dairy Farm (hereinafter, "JDF"). The plan is now administered by a committee known as the Plan Administrative Committee of the Jones Dairy Farm Union Employees' Pension Plan (hereinafter, Committee). Plaintiff is seeking disability benefits which were denied him and also seeks compensatory and punitive damages from JDF. Jurisdiction of the claim for disability benefits is based on the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(e).

## FACTS

Plaintiff John Pokratz was employed by Jones Dairy Farm from 1967 until June 6, 1983. However, his active employment ceased on June 6, 1980, at which time he was suffering from retinitis pigmentosa, a progressive eye disease, and from depression. It is undisputed that plaintiff is legally blind, and has been since at least September 1980.

Plaintiff applied for disability benefits from the plan in December 1981, although it is alleged by him that he attempted to apply some time previously. His application was submitted to the company.

During 1982, plaintiff was evaluated by Opportunities, Inc., a rehabilitation service. The evaluation report noted that he had worked at JDF for 13 years with duties of night shift clean-up work. The 11 years prior to this employment were spent as a general laborer at a sand and gravel company and as a truck driver and machine operator. Medically, the report noted that his general health was good, that he had been treated for depression and, with respect to his eyes, stated:

Has a diagnosis of retinitis pigmentosa in both eyes. This constitutes a severe visual impairment that has progressively gotten worse over the past 20 years. John indicates that his right eye is worse and that he gets headaches when he has to strain for reading, etc. Light levels appear to help with sunny-bright days being the best. Adaptive equipment does not appear to help.

Record, page 36. It was also noted that his education was limited to a high school diploma. Fairly extensive testing disclosed verbal skills at about the ninth grade level; arithmetic at about the third grade level. He handled assembly tests well, but had trouble with tests involving color differentiation and with reading diagrams. He had adequate range of motion. The report included at-work observations in an orchard and in the rehabilitation shop, where he was assigned duties such as folding library files, tape cutting, and lock assembly. The report concluded that he enjoyed working outside in the orchard, although he was afraid of being struck by branches and would not climb a ladder. He was productive in both the orchard and in the shop, but did not communicate with co-workers or superiors. In the shop it was observed that he mainly relied on his sense of feel rather than residual sight. He refused to ask questions, which resulted in mistakes which took time to correct. Opportunities, Inc. summarized its findings as follows:

Skill wise, John has a lot going for him. His good work habits and good general health along with previous work experience give him a lot of potential for competitive employment. His size and strength are definite assets along with appropriate appearance and attendance/punctuality. His depressed attitude and unwillingness to cooperate with anybody are his major vocational liabilities. He probably would be successful in some sort of a job in which he could handle his vision problems and not have to communicate with anybody. In terms of his vision, he appears to need a fairly

structured position that is well illuminated and possibly outdoors or close to natural light. John is concerned about safety and is aware of problems with him being around dangerous equipment. It seems that some sort of routine farm jobs such as a milking parlor or in a packaging—shipping/receiving department would be appropriate, especially if they required his strength and full range of motion capabilities. Individual assembly work would also be a potential for him, however, he indicated he goes crazy on piece rate work, etc.

I feel very strongly that John needs professional help and/or medication to help him with his depression and releave (sic) his frustrated behavior. He obviously needs to communicate with both his family and the community or it will be very hard to get him a job. Even if we were able to get him a job, I can't imagine co-workers wanting to be around him with his current personality problem. His current mental health problem is obviously his major disability with his vision problem being secondary.

It is alleged by the defendants, and one-sided correspondence from JDF shows, that plaintiff had asked that his application be put on hold sometime in early 1982.[1] In August 1982, the application was again under consideration, and an official denial of benefits, dated December 1, 1982, was issued. An identical denial was issued December 7, 1982, after plaintiff informed the company that he had not received the first one. The denial stated as follows:

With the information you have provided to us and our own review of the facts in this case, we have determined that you are not totally and permanently disabled as defined in our pension plan.

We realize that you have been declared legally blind, but this condition in itself does not qualify you for disability coverage under our Pension Plan. The fact that you have been employed for a num-

---

1. The Court at this stage is not attempting to engage in factfinding with respect to plaintiff's claims of bad faith and delay. The noted fact is provided merely for the sake of continuity.

ber of months by Poyer Orchards, have had job training opportunities, and have had other employment placement opportunities available to you indicates that your general health does not preclude you from gainful employment.

In January 1983, plaintiff submitted the report of Dr. Frederick J. Davis, of Davis-Duehr Eye Associates, Madison, Wisconsin. The doctor, an M.D., noted that plaintiff was suffering from retinitis pigmentosa, that he was completely blind except for light perception in the right eye, that vision in the left eye was 20/20 but was limited to a 10% straight-ahead field of vision, that these limitations amounted to legal blindness, and concluded:

> Because of your visual field loss, however, you are unable to see to walk or get around without help, particularly in unfamiliar surroundings. This visual loss would preclude any employment that requires accurate vision, movement or contact with moving machinery or moving parts.

Record, page 58. It appears that the Committee treated this submission as a reapplication. Record, page 63. A new evaluation of plaintiff was scheduled with Crawford Rehabilitation Services, Milwaukee, Wisconsin, which was performed in April 1983.

The Crawford report concluded that plaintiff was capable of performing occupations such as kitchen helper, packager, orchard worker and assembler. The conclusion also included the following statements:

> Mr. Pokratz's description of his limitations is considerably more debilitating than that indicated by the medical records which I have reviewed. It is my impression from meeting Mr. Pokratz and reviewing his material that he is quite invested in presenting himself as a disabled individual and has placed most of his effort into obtaining disability benefits.
>
> \*   \*   \*   \*   \*   \*

In reviewing the report of Opportunities, Inc., it appears that the vocational evaluators and vocational rehabilitation staff believed that work adjustment training services and job placement services could be successful in returning Mr. Pokratz to competitive employment. The major obstacle to initiating such a program seems to be Mr. Pokratz's refusal of further services. Based on my interview with Mr. Pokratz, it is my opinion that his desire to receive vocational or personal counseling has not changed.

Record, pages 80–81. The interviewer concluded that plaintiff was capable of employment, but that the most significant obstacle to his employment was his own "lack of motivation." The interviewer recommended an investigation as to whether there may be psychiatric bases for this problem, and plaintiff was referred to Dr. Francis Millen for a psychiatric evaluation.

Dr. Millen's evaluation, dated July 11, 1983, noted the previous evaluations and medical history of the plaintiff and concluded:

> Considering his overall general medical health and what I could learn about his work history, he should be able to return to some type of gainful employment if he were properly motivated, and would cooperate with rehabilitation programming.

Record, page 99. The lack of motivation was caused, according to the doctor, by a "probable lifelong history of adjustment difficulty and defective coping mechanisms, present since early childhood" as opposed to depression.

On August 10, 1983, plaintiff received a letter signed by William J. Shalhoub, JDF's manager of employee relations, informing him of the denial of benefits:

> The Plan Administrative Committee has determined that you are not totally and permanently disabled under the terms of the Plan [Section 201(u)]. Therefore, your appeal of the company's earlier denial of your claim for disability pension benefits is denied.
>
> It has been determined that you are not precluded from engaging in certain types of gainful employment. In other words, from the point of view of the medical and

rehabilitative studies done recently, there is work which you could perform for remuneration if you were so motivated.

Record, page 121. A series of inquiries from plaintiff's counsel were treated as a further appeal of the denial of benefits. By letter dated December 16, 1983, signed by Willard Lenton as Committee Chairman, the appeal was denied. After noting the reports discussed above, the letter concluded:

> The Committee does not consider Mr. Pokratz's motivational and cooperativeness deficiencies to constitute a total and permanent disability within the meaning of the Plan. Accordingly, his claim for disability retirement benefits is hereby denied in its entirety.

Record, page 167.

The pension plan in effect at least through June 30, 1980,[2] contained provisions at Section 3.08 which required that an employee be "permanently and totally disabled" before he could be entitled to a disability. The term was defined, in pertinent part, as follows:

> The Employer retains sole discretion to determine whether a Member is permanently and totally disabled. All of the following conditions must be met:
>
> \*  \*  \*  \*  \*  \*
>
> (b) The Member is determined by the Employer to be permanently and totally disabled by bodily or mental injury or disease and thereby prevented from engaging in any occupation or employment for remuneration or profit; . . .

Some time prior to December 1, 1982, and perhaps as early as July 1, 1980, a plan was in effect which contained the following provision pertinent to the issue before the Court:

> 2.01(u) "Total and Permanent Disability" means a disability which the Company determines in its sole discretion [3] is

the result of a bodily or mental injury or disease that has so permanently and totally disabled an Employee as to prevent him from engaging in any occupation or employment for remuneration or profit for a continuous period of six (6) consecutive months; . . .

Further facts will be cited in the decision which follows.

## MEMORANDUM

■ The standard of review in actions challenging the denial of pension benefits by a pension fund trustee is whether the action of the fund trustee was "arbitrary or capricious in light of the language of the plan." *Wardle v. Central States*, 627 F.2d 820, 824 (7th Cir.1980). The question is to be answered with the information before the trustee at the time of the decision and does not require a *de novo* hearing. *Id.*

■ In this case, the record is complete and undisputed in most respects. Whatever disputes of fact exist are not material to the question before this Court under *Wardle*. Plaintiff is not offering new evidence. Rather, plaintiff is challenging the decision to deny him benefits on the basis of the record. To the extent that there is a dispute which might be called material, it lies in which of the two plans in effect during the applicable time frame is the plan subject to review here.

The Court must conclude that it makes no difference because the operative language from the two plans is identical. Differences in the language of the two plans are not material to this dispute. For the purpose of deciding whether plaintiff is entitled to disability benefits, both plans require that he be permanently and totally disabled, meaning that he is disabled by "bodily or mental injury or disease [that prevents him] from engaging in any occupation or employment for remueration or

---

**2.** Exhibits A and B to the Lenton affidavit are the source for the text above. There is a dispute as to which plan was in effect and at what time.

**3.** It appears that this provision regarding the entity which would make disability determina-

tions was amended in November, 1982, that is, before plaintiff was denied benefits. However, the Court need not make any determination of this issue and does not do so now.

profit." This quoted language appears in both plans and is all that is material to this dispute.

The question therefore is whether, under the language quoted above, it was arbitrary and capricious to conclude that plaintiff was not permanently and totally disabled. The Court must conclude that the decision is not arbitrary or capricious.

The first line of inquiry is how to interpret the definition in the plan of permanently and totally disabled. Strictly and literally interpreting the words in the plan, it would appear to limit the payment of benefits to those who were absolutely incapable of doing anything for which money might be paid. Plaintiff has complained that Mr. Shalhoub, JDF's employee relations representative, told him that plaintiff was not disabled within the meaning of the language in the plan if he were able to sell pencils on the street corner. Without deciding whether such a statement was made, it must be conceded that the statement accurately reflects the literal terms of the plan.

It must also be conceded that plaintiff is not totally helpless, and, in fact, is capable of doing a number of jobs. The reports of both Opportunities, Inc. and Crawford Rehabilitation Services explicitly state that plaintiff is capable of gainful activity of various sorts. The qualification in the Crawford report—whether plaintiff's attitude had a psychiatric basis—was resolved by Dr. Millen's evaluation. Accordingly, if the language of the plan is given anything close to a plain meaning interpretation, it is clear that there is nothing arbitrary or capricious about the conclusion of the Committee.

Plaintiff urges a more restrictive reading of the plan language, citing *Harker v. Paul Revere Life Insurance Company,* 28 Wis.2d 537, 137 N.W.2d 395 (1965). In that case, the Wisconsin Supreme Court interpreted the following provision in a disability insurance policy:

The term "total disability" ... shall mean complete inability of the insured to engage in gainful occupations for which he is reasonably fitted by education, training and experience.

*Id.* at 398. The Court cited with approval the rule stated in 98 A.L.R. 788, 789:

The liberal rule, as shown in the earlier annotations, is that the "total disability" contemplated by an accident policy, does not mean, as its literal construction would require, a state of absolute helplessness; rather, that the disability contemplated means inability to do all the substantial and material acts necessary to the prosecution of the insured's, or, in many instances, any, business or occupation, in a customary manner.

*Id.* at 400 (footnote omitted). The Court approved a jury verdict in favor of a plaintiff whose wrist had been broken and healed badly, despite evidence that he did return to work (with significantly decreased ability) as an iron worker. He later attempted selling and hospital maintenance work. He also had previously worked as a farmer and a mechanic.

Another A.L.R. annotation cited with approval (but in a different context) in *Harker,* at 399, appears at 1 A.L.R.2d 756. The annotation concerns loss of vision within disability insurance provisions. In a section concerning disability provisions which appear to require that a claimant be "prevented from engaging in any occupation or employment for wage or profit," it was stated:

Although the statements of the courts that in order to come within the meaning of the disability clause the disability of the insured must go to such extent that it disables him from following any occupation are general in their wordings and do not make any exceptions, if the problem came squarely before a court, it seems highly probable that some limitation would be recognized by it in order to avoid undesirable results. This opinion is predicated upon the fact that no court insists upon a state of absolute helplessness as a condition precedent for recovery under a disability clause. And since even a small amount of mental and physical ability permits, in theory at least, the

insured to follow some occupation, the two doctrines would be in conflict with each other. The obvious solution, which at the same time satisfies most (sic) the ordinary conception of occupation, lies in the adoption of a less technical and more practical definition of occupation by excluding therefrom the various ways of earning a livelihood which in popular conception do not rise to the dignity of an occupation and which are characterized by the common examples of selling shoelaces or pencils, or which exist more in the fertile imagination of opposing counsel than in the reality of economic life.

1 A.L.R.2d at 773.

Therefore, it appears that something less than a strict and literal reading of the disability provision is required.

A careful reading of the record, however, does not disclose that the Committee was denying benefits because plaintiff could sell pencils (whether or not such a statement was ever made by Mr. Shalhoub). Rather, the Committee explicitly depended upon the reports of doctors and rehabilitation experts which disclosed that the plaintiff could handle a fairly wide range of unskilled jobs. While it may be assumed that none of these jobs would be as remunerative as his previous job, nothing in *Harker* or any other case of which the Court is aware requires jobs of equal pay to be available in these circumstances.

Accordingly, it cannot be said that denial of benefits to plaintiff was arbitrary or capricious on this record. The motion of the defendant plan for summary judgment must be granted.

Plaintiff's complaint contains two claims and he has also moved to file an amended complaint which essentially restates the causes in his original complaint. It is clear that this Court cannot exercise jurisdiction over these claims if they are purely pendent state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The first claim in the original complaint alleged a breach of fiduciary duty on the part of JDF and the plan administrator (there is some dispute as to whether, at some pertinent time, JDF was the plan administrator). One of these alleged breaches was the denial of benefits in an arbitrary manner. The Court has treated this claim above. The remaining claims of breach of fiduciary duty involve alleged failures to promptly act, reasonably consider and provide full and fair review of plaintiff's claim. These breach of duty claims are also embodied in Count II of the proposed amended complaint. The second claim in the original complaint alleged bad faith on the part of JDF in processing the claim. This has become Count III of the proposed amended complaint.

Plaintiff argues that the fiduciary breach claims are cognizable under ERISA, citing *Russell v. Massachusetts Mutual Life Insurance Co.*, 722 F.2d 482 (9th Cir.1983), cert. granted sub nom *Mass Mutual Life v. Russell*, —— U.S. ——, 105 S.Ct. 81, 83 L.Ed.2d 29 (1984). In *Russell*, the Court decided that ERISA did provide an action for violation of fiduciary duties along with compensatory and punitive damages. However, it did so in the following language:

> Thus a beneficiary or participant may, pursuant to section 1132(a)(2) bring a cause of action under section 1109(a) for the breach by a fiduciary of any responsibility, duty or obligation imposed by the Act, <u>assuming, of course, that the breach causes him some injury.</u>

*Id.* at 488 (emphasis supplied). This Court finds the underlined language persuasive of the view that, unless plaintiff has a claim for unpaid benefits, he has no claim under § 1109.

Even if this were not so, the Court does not read § 1109 as expansively as the Ninth Circuit. Section 1132, the section which grants the right to bring suit, allows a beneficiary to bring suit for relief which is "appropriate" under § 1109 (§ 1132(a)(2)). Section 1109 reads:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties im-

posed upon fiduciaries by this subchapter shall be personally liable to make to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. . . .

It is clear to this Court that this section allows for two kinds of relief. One is the recovery for the plan of such assets that were misappropriated by a trustee. The other is for such other "equitable or remedial" relief found to be necessary by a Court. The Ninth Circuit held that such relief included compensatory and punitive damages. This Court does not agree. It would appear that "other equitable or remedial" relief ought to be limited to mandamus or declaratory relief necessary to effectuate the purposes of the act.

This Court would suggest that the holding of the Ninth Circuit was necessitated by its decision that ERISA preempted state claims for bad faith and breach of contract. It decided that Congress would hardly preempt such claims without providing equivalent federal relief. Such assumptions about Congressional intent are questionable, and the argument made in *Russell* would have been just as persuasive against a holding of preemption in the first place. At any rate, the Court did hold that punitive and compensatory damages were available. This Court finds nothing in the language of ERISA or binding precedents to require such a holding. And this Court declines to so hold because it is unconvinced that the term "equitable or remedial" relief can ever be read so expansively as to include compensatory or punitive damages.

Finally, plaintiff urges this Court to recognize a claim for bad faith performance of a fiduciary duty which is a state common law action as an ERISA claim. While Wisconsin has explicitly recognized such a claim regardless of the right of a claimant to benefits,[4] the Court is not persuaded that such a claim can be subsumed into ERISA. Plaintiff makes this argument with the support of scant authority, *Hayden v. Texas-U.S. Chemical Company*, 557 F.Supp. 382, 385 (E.D.Tex.1983), where it was held that a worker could raise pre-ERISA state law rights as ERISA claims. As the case cited for this proposition by the Texas court, *Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966 (5th Cir. 1981), makes clear, this would be true only for substantive pre-existing pension rights. This authority does not require recognition of a federal cause of action under ERISA for what has been a very limited, and recent, state common law claim for insurance bad faith.

It is, therefore, clear that plaintiff's right to recover is limited to a state law claim for bad faith which is precisely the same as his claim for breach of fiduciary duties, since in Wisconsin the existence of the claim depends upon fiduciary responsibility in the defendant. *See Anderson v. Continental Insurance*, 85 Wis.2d 675, 271 N.W.2d 368 (1978). As this is purely a state law claim, and the Court is without any federal basis for jurisdiction given its decision regarding the review of the record mandated by *Wardle*, dismissal is mandated by *United Mine Workers v. Gibbs, supra.*

The motion of defendant Jones Dairy Farm to dismiss it as a party is, in light of the foregoing, moot.

### ORDER

IT IS ORDERED that the motion of the defendants for summary judgment on

---

4. *Lueck v. Aetna Life Ins. Co.*, 116 Wis.2d 559, 342 N.W.2d 699 (1984), cert. granted-*sub nom Allis Chalmers v. Lueck*, —— U.S. ——, 105 S.Ct. 80, 83 L.Ed.2d 28 (1984). Presumably, the appeal of Lueck does not involve whether a claim can be stated for bad faith absent a good claim for benefits since that would appear to be solely a matter of state law. The issue which must be the subject of the appeal is whether federal law (in this case the Labor Management Relations Act) preempts such a claim. The argument of the majority in this case is diametrically opposed to, and more convincing than, the similar discussion in *Russell, supra.* It would not be surprising to see these cases decided by the Supreme Court together.

plaintiff's claim for disability benefits under ERISA is GRANTED. Judgment shall be entered with prejudice and costs.

IT IS FURTHER ORDERED that plaintiff's remaining claims, being cognizable under state law only, are DISMISSED without prejudice or costs.

IT IS FURTHER ORDERED that plaintiff's motion to file an amended complaint is DENIED, the new complaint raising the same issues which have received consideration herein.