Claude WARDLE, Sr.,
Plaintiff-Appellant,

v.

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Defendant-Appellee.

No. 79–2295.

United States Court of Appeals, Seventh Circuit.

Argued May 1, 1980.

Decided Aug. 14, 1980.

William M. Olah, Terre Haute, Ind., for plaintiff-appellant.

Alan M. Levy, Milwaukee, Wis., for defendant-appellee.

Before SWYGERT, PELL and CUDAHY, Circuit Judges.

SWYGERT, Circuit Judge.

A Teamsters pension fund denied a truck owner-operator's application for retirement benefits because he allegedly lacked employee status in the industry for a number of years. The applicant challenges the denial in this action under § 502 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132. On appeal, we affirm the district court's refusal to overturn the fund's denial of pension benefits and its denial of the applicant's motion for a jury trial.

In September 1974 Claude Wardle applied for pension benefits from the Central States, Southeast and Southwest Areas Pension Fund in anticipation of his retirement at the end of the following February after forty-five years as a truck driver. Wardle had driven for Purcell & O'Haver, which was engaged in the manufacture of lumber, from 1954 through 1961 and for Lovelace Truck Service, a common carrier, starting in 1961.[1] Wardle had withdrawn his Teamsters membership card when he began work for Purcell but had reinstated his membership when he switched to Lovelace. Central States had not received pension contributions on Wardle's behalf during his employment at Purcell, which was not unionized, but had during his stint at Lovelace, although the evidence is conflicting as to whether Wardle or Lovelace had actually paid the contributions. From 1954 through 1972, Wardle had done all his driving in equipment that he owned. In September 1972 he had disposed of his truck tractor and thereafter had driven only trucks owned by Lovelace.

Wardle's application for retirement benefits was to be judged according to the terms of Central States' written Pension Plan, as constituted July 1, 1973. One requirement for eligibility was the completion of "twenty years of continuous service in the industry." Pension Plan, Art. I, Sec. 15.[2] The Plan defined "continuous service in the industry" to mean years of employment after the applicant's last "break in service." Pension Plan, Art. I, Sec. 14.[3] The definition of continuous service in the industry also specified that any time spent self-employed in the industry was not creditable toward satisfaction of this requirement. The Plan did not expressly define "self-employed," but did define "employee status." One requirement for such status was the following:

> In all instances, the common law test, or the applicable statutory definition of master-servant relationship shall control.

Pension Plan, Art. I, Sec. 7(d).

After receipt of Wardle's application for retirement benefits, Central States sought

---

1. Wardle continued to drive for Lovelace Truck Service and its successor, Commercial Lovelace Motor Freight, Inc., until 1978.

2. Article III, Section 1 of the Plan, which concerned the payment of benefits, provided that "An employee who has reached the NORMAL RETIREMENT DATE shall be eligible for the retirement benefit provided for by this Pension Plan." (Capitalization in original.) Article I, Section 15 defined Normal Retirement Date for employees who became members of the Plan prior to July 1, 1967, such as Wardle if his contentions are accepted, as the date on which all of four specified requirements are met. The only requirement that Central States has contended Wardle has not met is that of "twenty years of continuous service in the industry."

3. A break in service occurred when an employee was not in "covered employment" for five consecutive years between February 1, 1955 and April 1, 1969 or for three consecutive years after April 1, 1969. Pension Plan, Art. I, Sec. 13. Although extremely complex, the definition of covered employment may for present purposes be summarized as "[e]mployment requiring the usual Teamster skills in traditional Teamster industries at the time of such employment." Art. I, Sec. 11–A(1)(C).

information verifying his claim. It obtained, with Wardle's permission, earnings data from the Social Security Administration, statements from officials at both Purcell and Lovelace, responses to a six-page questionnaire about the details of Wardle's employment arrangements from both company officials and Wardle, and copies of Wardle's lease agreements with Lovelace.

On the basis of most of these documents, Edward Murtha, Administrator of the Pension Benefits Division, wrote Wardle on September 10, 1975, informing him of the denial of his application by the Pension Payment Committee of the Trustees. The reason given was that Wardle had been out of "covered employment," as defined by the written pension agreement,[4] from 1954 through August 1972 and therefore had incurred a break in service disqualifying him from receiving pension benefits. More specifically, the letter related, Wardle had not shown that he had had "employee status" while working for Purcell from 1954 to 1961 and for Lovelace from 1961 through August 1972. The letter indicated further that "[s]elf-employment cannot be considered covered employment."[5]

The Committee later reexamined Wardle's application. On March 3, 1976 Regina Sedin, Supervisor in the Pension Processing Department, wrote Wardle informing him that the Committee had decided to "reaffirm their previous decision" and enclosed a copy of the earlier letter from Murtha. Sedin's letter also noted an affidavit of the Lovelace payroll clerk stating that pension contributions had been deducted from Wardle's paycheck from June 1961 through September 1972 and suggested, on behalf of the trustees, that Wardle apply for a refund of these contributions.

Wardle then brought this suit in federal court seeking review under 29 U.S.C. § 1132(a)(1)(B) of Central States' denial of his application. The complaint styled itself as one for compensatory damages of $92,-

400, the amount of benefits that Wardle estimated would accrue during his lifetime, punitive damages of $250,000, reasonable attorney fees and costs, and "all other just and proper relief." Wardle also filed a jury trial request with the district court. On April 23, 1979 the district court granted Central States' motion to strike Wardle's demand for a jury trial on the ground that this suit under ERISA was equitable in nature. On the same date the court denied Wardle's motion to increase his demand for punitive damages and ruled that punitive damages were not recoverable under ERISA. On September 27, 1979, after the receipt of stipulations, the presentation of evidence, and the hearing of oral argument, the court upheld Central States' decision to deny Wardle any pension benefits.

On appeal Wardle challenges all three rulings of the district court. We consider his contentions that the district court erred in upholding Central States' decision and in denying him a jury. Because we affirm the district court's ruling on both these points, we need not consider its ruling on the punitive damages claim.

### I.

Wardle's principal contention on appeal is that Central States' decision to deny him retirement benefits is erroneous as a matter of law. We first discuss the appropriate standard of review in an ERISA action of a decision by pension fund trustees to deny pension benefits; we then apply that standard to the facts at bar.

The parties agree on the standard of review to be applied in this case. In *Reiherzer v. Shannon*, 581 F.2d 1266, 1272 (7th Cir. 1978), a case in which Central States was a defendant and in which the 1973 edition of the Plan also applied, we established that a challenge under § 502(a)(1)(B) of ERISA to a denial of pension benefits by a pension fund's trustees was to be overturned by a federal court

---

4. The letter indicated that the relevant definition was to be found in Article I, Section 11–A of the pension agreement.

5. The letter also informed Wardle of his right to appeal the decision to the Pension Payment Appeals Committee.

only if it was "arbitrary and capricious in light of the language of the Plan." Along with the Fifth and Eighth Circuits, we thus applied the traditional standard of review of the law of trusts used in diversity jurisdiction cases challenging such decisions. *Bayles v. Central States Pension Fund*, 602 F.2d 97, 99–100 & n.3 (5th Cir. 1979); *Bueneman v. Central States Pension Fund*, 572 F.2d 1208, 1209 & n.3 (8th Cir. 1978); *see also Riley v. MEBA Pension Trust*, 570 F.2d 406, 408, 410 (2d Cir. 1977) (same standard of review applies to trustees' plan interpretations in an action seeking relief under § 502(a) generally).[6] The use of this standard of review in federal courts apparently originated in the District of Columbia Circuit, which has phrased the standard as "whether the Trustees have acted arbitrarily, capriciously, or in bad faith; that is, is the decision of the Trustees supported by substantial evidence or have they made an erroneous decision on a question of law." *Danti v. Lewis*, 312 F.2d 345, 348 (D.C.Cir. 1962). *See also Rehmar v. Smith*, 555 F.2d 1362, 1371 (9th Cir. 1976). A federal court is to focus on the evidence before the trustees at the time of their final decision and is not to hold a *de novo* factual hearing on the question of the applicant's eligibility. *Phillips v. Kennedy*, 542 F.2d 52, 54 (8th Cir. 1976). As a general matter a court should not resolve the eligibility question on the basis of evidence never presented to a pension fund's trustees but should remand to the trustees for a new determination. *See id.* at 55 & n.10; *Sturgill v. Lewis*, 372 F.2d 400 (D.C.Cir.1966); *Pickett v. UMW Health & Retirement Funds*, 467 F.Supp. 2 (E.D. Tenn.1978); *Ruth v. Lewis*, 166 F.Supp. 346, 349 (D.D.C.1958).[7]

6. The Eighth and Ninth Circuits have applied this standard of review in similar cases based on § 301 of the Labor-Management Relations Act. *Maness v. Williams*, 513 F.2d 1264, 1265 & n.1 (8th Cir. 1975); *Rehmar v. Smith*, 555 F.2d 1362, 1366–67, 1369–71 (9th Cir. 1976).

7. Some cases, tried on stipulated or undisputed facts before the district court, have not expressly faced this issue. *See, e. g., Bayles v. Central States Pension Fund*, 602 F.2d 97, 98 (5th Cir. 1979); *Reiherzer v. Shannon*, 581 F.2d

■ The parties agree that the substantive eligibility issue in this case is whether Wardle had employee status while working for Purcell and Lovelace prior to September 1972. The parties also appear to agree that the critical issue in the determination is whether Wardle satisfied Section 7(d) of Article I of the Plan. Since neither party contends that any applicable statutory definition of employee exists, the standard is that of common law master-servant.

■ We long ago summarized the common law master-servant test to be applied to distinguish between an employee and an independent contractor.

[T]he employer-employee relationship exists when the person for whom the work is done has the right to control and direct the work, not only as to the result accomplished by the work, but also as to the details and means by which that result is accomplished, and that it is the right and not the exercise of control which is the determining element. A number of tests were pointed out, such as the right to hire and discharge persons doing the work, the method and determination of the amount of the payment to the workmen, whether the person doing the work is engaged in an independent business or enterprise, whether he stands to make a profit on the work of those working under him, the question of which party furnishes the tools or materials with which the work is done, and who has control of the premises where the work is done. In addition to the tests there mentioned, consideration must be given to other factors, such as whether the relationship is of a permanent character, the skill required in the particular occupation, and who designates the place where the work is to be performed.

1266, 1268 (7th Cir. 1978); *Maness v. Williams*, 513 F.2d 1264, 1265 (8th Cir. 1975).

Both parties before us appear to agree that we should review Central States' decision only in light of facts before its Committee at the time. Yet additional evidence was presented to the district court on the issue of Wardle's status with Purcell and Lovelace, and both parties argue that this evidence supports their respective contentions on the question of eligibility.

*NLRB v. Phoenix Mutual Life Ins. Co.*, 167 F.2d 983, 986 (7th Cir.), *cert. denied*, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948). *See also Restatement (Second) of Agency* § 220 (1958). The belief of the parties has also been thought relevant, although in most cases not determinative. *See id.* § 220(2)(i) & Comment m. Courts have also allowed consideration of how the parties structure their Social Security and income tax relations.[8] Illinois law, which the Plan itself indicates should control questions of construction, *see* Pension Plan, Article VI, is not materially different, although the cases stress the elements of the right to control the details of the work, the right to discharge, which seems to be a requirement for finding an employer/employee relationship, and the term of employment. *See Hayes v. Morse*, 347 F.Supp. 1081, 1085 (E.D.Mo.1972), *aff'd*, 474 F.2d 1265 (8th Cir. 1973); *Meyer v. Industrial Comm'n*, 347 Ill. 172, 178–79, 179 N.E. 456, 458 (1931).[9] In most instances of decision,

> there is no shorthand formula or magic phrase that can be applied to find an answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total

factual context is assessed in light of the pertinent common-law agency principles. *NLRB v. United Ins. Co.*, 390 U.S. 254, 258, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). *See also Henn v. Industrial Comm'n*, 3 Ill.2d 325, 327, 121 N.E.2d 492, 494 (1954); *Darner v. Colby*, 375 Ill. 558, 560, 31 N.E.2d 950, 951 (1941); 17 Ill.Law & Prac., *Employment* § 4 (1956).

■ In this context Wardle's several specific contentions on the substantive aspects of this appeal can be condensed to the following arguments in the alternative: (1) that, on the facts known to Central States at the time of its decision,[10] Wardle was an employee of Purcell and Lovelace as a matter of law, and (2) that the Committee lacked sufficient evidence on which to conclude that Wardle was self-employed.

Wardle first argues that he was an employee of Purcell as a matter of law because some aspects of his employment relationship indicate an employee status. Wardle was subject to the company's authority with respect to hiring, firing, and discipline. He was treated no differently than employees who were not owner-operators with respect to fringe benefits and working condi-

8. *See Carter v. Central States Pension Fund*, No. 77–2078 (D.Kan. Nov. 1, 1978); *Mendise v. Central States Pension Plan*, 90 L.R.R.M. 3208, 80 Lab.Cas. ¶ 11887, at 22503 (N.D.Ohio 1975); *Ramsey v. Lewis*, 55 Lab.Cas. ¶ 12022, at 19372, 19374–75 (E.D.Tenn.1966); *Manahan v. Daily News-Tribune*, 50 Ill.App.3d 9, 16, 365 N.E.2d 1045, 1050, 8 Ill.Dec. 659 (1977); *Munts v. Fitzsimmons*, 25 Ill.App.3d 109, 111–12, 323 N.E.2d 153, 155 (1975); *Westlund v. Kewanee Pub. Serv. Co.*, 11 Ill.App.2d 10, 24, 136 N.E.2d 263, 270 (1956); *see also Mueller v. Cities Serv. Oil Co.*, 339 F.2d 303, 307 (7th Cir. 1964).

This court has stressed, however, the limited role that Social Security records should play in this determination. *See Reiherzer v. Shannon*, 581 F.2d 1266, 1272–73 (7th Cir. 1978). We also note that the standard for determining whether a person is an employee for Social Security purposes is basically identical to the common-law standard. *See Hoosier Home Improvement Co. v. United States*, 350 F.2d 640, 642–43 (7th Cir. 1965).

9. Illinois courts have considered Social Security and income tax returns as factors in the decision, *see* note 8 *supra*, as well as the parties' intentions, as expressed in the contract or

by their acts. *See Manahan v. Daily News-Tribune, supra*, 50 Ill.App.3d at 14, 365 N.E.2d at 1049; *see also Mueller v. Cities Serv. Oil Co., supra* note 8, 339 F.2d at 307.

10. We consider the Committee's decision of March 3, 1976 after reexamination of Wardle's file to be the relevant one for our purposes. If an earlier denial that is arbitrary and capricious because of insufficient evidence is followed by a denial on reconsideration that is based on additional information that provides an adequate basis for the decision, we surely should not order payment of the applicant's benefits absent evidence of bad faith.

We also include in our review facts contained in the parties' stipulations before the district court.

Wardle argues that there is no evidence in the record showing that the Committee actually considered all the information it had available. However, Central States' answer to supplemental interrogatory 23, which includes copies of all factual documents then available to the Committee, states that the Committee's decision was made on the basis of the documents.

tions. Purcell determined when Wardle reported to work, the hours he worked, and the routes he took. Wardle could refuse trips only because of illness or poor road conditions. He drove subject to the company's work rules. Wardle worked a minimum of 40 hours a week for Purcell and drove for no one else during that time. Wardle owned no other trucks and had no drivers working under him.

■■■■ Nevertheless, Central States' decision was not arbitrary or capricious or erroneous as a matter of law because other aspects of Wardle's employment indicate an entrepreneurial independent contractor status. Wardle was paid on a different basis than employees who were not owner-operators.[11] His compensation, which was paid in one check for both services and equipment, was calculated not by the hour or week but by mileage. He was fully responsible for the maintenance of his truck, including license and maintenance insurance. Purcell provided no assistance in financing Wardle's purchase of his truck, which bore the name "Claude Wardle Trucking," or in paying for fuel, tires, and repairs. Thus Wardle made all those decisions on his own. Wardle never bound himself by lease to work exclusively for Purcell and was subject to no restrictions on the personal use of his truck or his solicitation of business elsewhere. Wardle was also not on the same seniority list, which presumably affected jobs to be taken, as employees who were not owner-operators. Purcell did not withhold any federal income tax or Social Security tax from Wardle's check, and Wardle represented himself as self-employed for all tax purposes.

■■■■ We conclude further that Central States' decision that Wardle was self-employed while working for Lovelace was not erroneous as a matter of law. The Lovelace relationship again falls between pure employee and pure independent contractor status. Wardle highlights the following aspects of his employment at Lovelace: Like Purcell, Lovelace had authority to hire, fire, and discipline him. Lovelace also decided when Wardle reported to work, the hours he worked, and the routes he worked. Wardle could refuse a trip only because of illness. Lovelace paid hospitalization insurance for Wardle. Wardle's lease placed his truck in "the exclusive possession, control, and use" of Lovelace. His tractor bore a sign indicating that it had been leased to Lovelace. During virtually all of the contested period, Wardle serviced one customer, whose business he had not solicited, on one route. Wardle also did not have his own operating authority from the Interstate Commerce Commission, but drove under Lovelace's.

Yet because aspects of Wardle's relationship with Lovelace resembling an independent contractor status are numerous also, Central States' determination that Wardle was not an employee of Lovelace was again not erroneous as a matter of law or arbitrary or capricious. Wardle purchased his tractor without any assistance from Lovelace, and was alone responsible for the upkeep of the tractor. Under the lease, Wardle was to save Lovelace harmless from all shippers' claims for loss or damage.[12] Wardle was paid on the basis not of time worked but of mileage and revenue. While the applicable collective bargaining agreement required that owner-operator employees be paid in separate checks for equipment rental and driving services, Wardle received a single check for both.[13] Lovelace

---

11. In distinguishing between employees and independent contractors, Illinois courts have considered the fact that the person under consideration is treated differently than employees with respect to benefits. *Munts v. Fitzsimmons*, 25 Ill.3d 109, 112, 323 N.E.2d 153, 155 (1975).

Wardle also argues at points that it is impermissible to consider the mode of payment under Illinois law. Illinois courts clearly have considered it. *See* 17 Ill.Law & Prac., *Employment* § 4, at 373 (1956).

12. Wardle's deposition, which was not before the trustees and was not stipulated to in the district court, indicates that Lovelace paid for all insurance except when Wardle was "bobtailing," *i. e.*, driving his tractor without a Lovelace trailer.

13. Wardle argues that the noncompliance of his Lovelace working arrangement with the collective bargaining agreement provisions for owner-operator employees cannot be con-

did not withhold federal income tax or Social Security taxes from Wardle's check and did not pay any Social Security taxes on Wardle's behalf. Wardle made workers' compensation and unemployment contributions himself. His status for federal income tax and Social Security purposes was "self-employed." To the same effect is the fact that although pension contributions were made to Central States, a sworn statement of Lovelace's payroll clerk indicated that Wardle paid these contributions through a deduction in his check.[14] Although under the same union contract, Lovelace's employees who were not owner-operators were not paid in the same manner as Wardle, and were, for all but the last of Wardle's years as an owner-operator, not on the same seniority list.

Therefore, Central States' determinations that Wardle was not an employee of Purcell and Lovelace were not arbitrary or capricious or erroneous as a matter of law. Although we might as an original trier of fact have decided that Wardle was an employee of both companies, we cannot overturn the decision of the Plan's trustees.[15]

sidered against him because his arrangement was void and void contracts cannot be used against a party unless the claim is based directly thereon. See 17 Am.Jur.2d, Contracts § 219 (1964). Wardle incorrectly believes Central States to be arguing for nonenforcement of the Pension Plan, which is considered a part of the collective bargaining agreement, because the Plan grew out of or is immediately connected with the allegedly void arrangement. See id. § 218. Instead, Central States is arguing that failure to follow collective bargaining agreement provisions for establishing employee status for owner-operators is one factor relevant to deciding whether Wardle had employee status.

14. The original questionnaire filed by Lovelace and a letter from the company's president received after the payroll clerk's statement both indicated that Lovelace made the pension contributions, but the Committee was free to conclude otherwise.

We note that Central States has never purported to base its denial of Wardle's application directly on a contention that these contributions were contrary to the terms of the Plan. Central States has also offered to refund to Wardle all pension contributions made on his behalf if consistent with this court's holding in Martin v. Hamil & Butler, 608 F.2d 725 (7th Cir. 1979).

15. Wardle cites a number of cases that he contends require a conclusion of an employee status on these facts. We consider the most significant ones.

Reiherzer v. Shannon, 581 F.2d 1266 (7th Cir. 1978), is distinguishable. In holding that Central States arbitrarily excluded an employee who was also the company's president and chief executive officer, the court stressed (1) that the Plan did not expressly exclude the time an employee is also a corporate officer from creditable service toward the continuous service in the industry requirement, (2) that the decision was inherently inconsistent because it treated as a change in the applicant's employee status the corporation's decision to file federal income tax as a Subchapter S corporation, and (3) that the trustees made no showing that corporate employees are generally not credited with service in the industry. By contrast in this case, although the Plan does not specifically exclude credit for owner-operators, it does expressly exclude credit for self-employed individuals and thus owner-operators who are considered self-employed. Wardle's disposal of his tractor to use Lovelace trucks was a clear change in an element relevant to his employment status, so the decision was not inherently inconsistent. And as indicated by the questionnaire in the other files in the record of owner-operators denied benefits, Central States investigates the employment status of owner-operators and denies benefits to some because of the details of their employment arrangements.

In Hayes v. Morse, 474 F.2d 1265 (8th Cir. 1973), aff'g 347 F.Supp. 1081 (E.D.Mo.1972), where owner-operators were found to be employees as a matter of law, they could not, by the terms of their contract, work for anyone else, the employer was to approve all substitute drivers, and the employer's name was on the truck. In addition, the employer financed the truck purchases of the owner-operators and held title until the loans were completely paid.

To the extent that the employment relationships in Joint Council of Teamsters 42 v. N.L.R.B., 450 F.2d 1322 (D.C.Cir.1971) (2–1 decision), resemble those here, we note that the panel majority decided that the Board's determination of employee status should stand because it was one of "two fairly conflicting views," not that the owner-operators were employees as a matter of law. We also note that the owner-operators in that case were paid by the hour and had no control over their rate of pay.

In Van Watermeullen v. Industrial Comm'n, 343 Ill. 73, 174 N.E. 846 (1931), a worker's compensation case, the owner-operator had no control over the amount of pay he received, and other employees of the employer had complete control of the loading and unloading of

We also cannot say that, in light of all these facts, the trustees' conclusions were not supported by substantial evidence. That various aspects of Wardle's employment seem inconsistent with others does not indicate a need for further factual research to resolve the conflicts; it merely indicates that his employment was of a hybrid variety.[16]

■ Another argument Wardle makes is that Central States' process of decision with respect to owner-operators was arbitrary and capricious because there is no evidence of the pension fund's consistent treatment of owner-operators. *See Reiherzer v. Shannon*, 581 F.2d 1266, 1273–74 (7th Cir. 1978). We must disagree. As noted above, in response to Social Security records indicating no employment, Central States sent questionnaires to the two employers and Wardle asking about the details of the employment relationships. The same or virtually identical questionnaires are found in many of the files in the record of other owner-operators denied pension benefits. Thus there is evidence of a consistency of treatment of owner-operators.[17]

■ With respect to the additional evidence on the merits presented for the first time to the district court, it is generally inappropriate for a court to make the initial consideration of whether such facts establish an applicant's eligibility for retirement benefits. *See* text at note 7 *supra*. In this case, however, the additional facts presented by Wardle to the district court strengthen his arguments only minimally. Remand to the trustees for consideration of these facts would be a "useless formality." *Ruth v. Lewis*, 166 F.Supp. 346, 349 (D.D.C.1958).

We therefore affirm the district court's decision upholding Central States' denial of Wardle's application for retirement benefits.

## II.

Because we have decided that the question of whether Wardle was an employee while working for Purcell and Lovelace was an issue of fact and not one of law, we must consider Wardle's argument that he was entitled to a jury in the district court. Wardle argues principally that ERISA grants him the right to a jury as a statutory matter. We agree with the district court, however, and conclude that Wardle was not entitled to a jury in this action.

Wardle bases his argument that ERISA provides him with a jury right on *Stamps v. Michigan Teamsters Joint Council 43*, 431 F.Supp. 745 (E.D.Mich.1977). The court in *Stamps* reasoned primarily that, even though ERISA does not specifically address the jury right issue, the statutory scheme itself and its legislative history compel the conclusion that § 502(a)(1)(B) provides a plaintiff suing for pension benefits due and owing with a right to a jury. Because the Constitution entitles a party to a jury for all legal claims, the statutory issue to the *Stamps* court was whether Congress, in § 502(a)(1)(B), had created a legal or equitable claim. The subsection itself is silent on that issue, but, according to that court, if claims under § 502(a)(1)(B) were construed as equitable, that subsection would become mere surplusage in light of § 502(a)(3), which expressly provides participants and beneficiaries with a right to bring civil actions for various kinds of equitable relief. The court thus concluded that, to avoid becoming superfluous, § 502(a)(1)(B) must

---

the truck. To the extent that that court seems to stress inordinately the right of control or supervision, we must respectfully disagree.

16. Wardle also argues that his federal income tax and Social Security status of "self-employed" is insufficient to support Central States' decision. That decision, however, was not based solely on Wardle's tax status.

17. Although Wardle does not raise this issue, we note with concern the skeletal nature of the

letters explaining the Committee's reasons for its decision. Although they informed Wardle that his application had been denied because he was self-employed while working for Purcell and Lovelace, the letters arguably did not set forth the reasoning behind the decision or the type of information necessary for him to qualify for a pension. *See* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503–1(f).

be construed as creating a legal right, which entitled Stamps to a jury. The court found further support for its conclusion in the Joint Explanatory Statement of the Committee of Conference, which reads in part:

All such actions in Federal or State courts are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor-Management Relations Act of 1947.

H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 4639, 5038, 5107. The court construed this statement to indicate, in light of its independent conclusion that Stamps was entitled to a jury under § 301 of the Labor-Management Relations Act on the part of his claim for pre-ERISA benefits, that a jury should also be provided for claims under § 502(a)(1)(B) of ERISA.[18]

We must respectfully disagree with the reasoning of the *Stamps* court. Even if it is assumed that *all* claims brought under § 502(a)(1)(B) are equitable in nature, that subsection would not be superfluous. The specific types of claims enumerated in § 502(a)(1)(B) would still have to be separated in some manner from general equitable actions under § 502(a)(3) because Congress granted state courts concurrent jurisdiction only over § 502(a)(1)(B) claims. 29 U.S.C. § 1132(e)(1). Thus the statutory scheme does not imply that § 502(a)(1)(B) claims are legal. The court's reliance on the legislative history is also flawed. The quoted statement merely indicates Congress' intent that federal courts should create federal common law in civil actions under § 502(a)(1)(B) of ERISA, just as the Supreme Court in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957), ruled that the courts could establish federal common law for claims "arising under" § 301 of the Labor-Management Relations Act. *See Rei-*

*herzer v. Shannon*, 581 F.2d 1266, 1271 (7th Cir. 1978). The Committee states that § 502(a)(1)(B) claims are to be regarded "in similar fashion" to § 301 actions, not that the identical rules of federal common law are necessarily to apply in both statutory claims.

We conclude that Congress' silence on the jury right issue reflects an intention that suits for pension benefits by disappointed applicants are equitable. Such suits under the law of trusts have existed for quite a while in state courts and have been entertained in federal courts under their diversity jurisdiction. These suits have been considered equitable in character. *See Davis v. Huge*, 91 L.R.R.M. 2234 (E.D. Ky.1975); *Genesta v. San Diego County Laborers' Pension Plan*, 87 Lab.Cas. ¶ 11702, at 22827 (S.D.Cal.1979); *Porter v. Central States Pension Fund*, 98 L.R.R.M. 3210 (N.D.Iowa 1978); *Sichko v. Lewis*, 191 F.Supp. 68 (W.D.Pa.1960). This conclusion has been based primarily on the law of trusts, which provides a beneficiary with a legal remedy only with respect to money the trustee is under a duty to pay unconditionally and immediately to the beneficiary. *Restatement (Second) of Trusts* §§ 197–198 (1959).[19] Thus the most reasonable interpretation is that Congress intended to provide general federal jurisdiction over these equitable suits that had traditionally been brought in state courts.

This interpretation of the statute finds support in many other considerations. First, although Congress gave federal courts exclusive jurisdiction over claims created under § 502 for violations of various provisions of ERISA, suits under § 502(a)(1)(B) remain within the jurisdiction of state courts. 29 U.S.C. § 1132(e)(1). In addition, as noted above, federal courts have interpreted the scope of their review in actions under § 502(a)(1)(B) to be identical to the limited review employed in earlier federal diversity actions. *See* text at note 6

---

18. The analysis of the *Stamps* court has been approved in *Pollock v. Castrovinci*, 476 F.Supp. 606, 608–09 (S.D.N.Y.1979).

19. We do not think that if Wardle had a right to benefits, he would be entitled to immediate and unconditional payment of all the benefits he would receive if he lived no shorter and no longer than his life expectancy.

*supra.* Although Wardle argues that the arbitrary and capricious standard is analogous to such questions as assumption of risk, which have been decided by juries, application of the arbitrary and capricious standard has traditionally been done by judges. In addition to indicating the traditional nature of Wardle's cause of action, the limited scope of review bespeaks a legislative scheme granting initial discretionary decisionmaking to bodies other than the federal courts, with which federal jury trials have proved incompatible. *See Curtis v. Loether,* 415 U.S. 189, 194–95, 94 S.Ct. 1005, 1008–09, 39 L.Ed.2d 260 (1974). This incompatibility is further evidence of the unlikelihood of any implied congressional intent to grant a jury right in these cases.[20] We therefore conclude that ERISA does not grant Wardle a right to a jury trial.[21]

For all the foregoing reasons, the decision of the district court is affirmed.

**20.** Wardle also relies heavily on *Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), which held that statutory language in the Age Discrimination in Employment Act of 1967 empowering a court to grant "legal or equitable relief" evidenced Congress' intent to grant the right to a jury decision of issues relevant to the winning of legal relief even though the statute did not include a specific grant of a jury right. As explained in our discussion of the *Stamps* decision, we do not think that §§ 502(a)(1)(B) and 502(a)(3) are to be read as establishing a clear and rigid dichotomy between legal and equitable claims, and we find this claim to be equitable in nature.

**21.** Wardle also argues that he is entitled to a jury under the Seventh Amendment as recently interpreted in *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). In light of our conclusion above that this claim is equitable, no further discussion is necessary to reject Wardle's constitutional argument.