Jeff EVANS and Demaris Evans,
Plaintiffs-Respondents,

v.

W.E.A. INSURANCE TRUST, Defendant-Appellant.
[Case No. 83–817.]

John A. OLSON and Mary Jane Olson,
Plaintiffs-Respondents,

v.

W.E.A. INSURANCE TRUST, Defendant-Appellant.
[Case No. 83–1061.]

Supreme Court

*Nos. 83–817, 83–1061. Argued September 4, 1984.—
Decided January 31, 1985.*

(Also reported in 361 N.W.2d 630.)

2

For the defendant-appellant there were briefs by *William Haus, Simon Karter* and *Kelly, Haus & Katz,* Madison, and oral argument by *Mr. Karter.*

For the plaintiffs-respondents in case no. 83–817 there was a brief by *Russell J. Reff* and *Flanagan & Reff,* Oshkosh, and oral argument by *Russell J. Reff.*

For the plaintiffs-respondents in case no. 83–1061 there was a brief by *Francis J. Slattery* and *Nolan, Engler, Yakes & Bauer, S.C.*, Oshkosh, and oral argument by *Mr. Slattery*.

HEFFERNAN, C.J.   These are appeals from two judgments of the circuit court for Winnebago county. We affirm.   This court on May 1, 1984, accepted these appeals on a consolidated certification of the court of appeals.   Both cases arise out of claims under a health insurance plan covering employees of the Oshkosh public schools or members of their families.   The plan is subject to the Federal Employee Retirement Income Security Act (ERISA), 29 U.S.C. sec. 1001, et seq.   The administrator of the plan is the Wisconsin Education Association Insurance Trust (Trust).

Each of the claimants, Demaris Evans and Mary Jane Olson, underwent gastric bypass surgery for the correction of obesity.   The claim for benefits to cover the expense of the surgery was denied in each case because the plan excludes "charges . . . which are not medically necessary," and it was asserted by the Trust that the surgery was not medically necessary when measured by Trust-generated guidelines.   Each claimant went through the claim-and-appeal procedure established by the Trust. When the Trust finally refused payment, Evans and Olson commenced separate actions in the circuit court to enforce their claimed right to benefits.   Each action resulted in a summary judgment for the plaintiff, ordering payment by the Trust of the expenses of surgery, pre-judgment interest, and attorney's fees.   The W.E.A. Insurance Trust appealed the separate judgments.   We affirm each of the judgments, concluding, as did the circuit courts in each case, that the denial of benefits was arbitrary and capricious and that the payment of benefits was required by the plan.

It is agreed by the parties that the health insurance plan is subject to the provisions of ERISA, 29 U.S.C. sec. 1132.[1] It is also agreed by the parties that, although the rights of the parties arise under the aegis of the federal law, there is, in respect to a participant or beneficiary, concurrent jurisdiction, and these rights may be vindicated in the courts of the several states. Both parties assert that the standard to be applied when reviewing the decision of the trustees is whether it was arbitrary and capricious. They both rely upon the language of *Wardle v. Central States, Southeast and Southwest Areas Pension Fund,* 627 F.2d 820, 824 (7th Cir. 1980), cert. denied 449 U.S. 1112 (1981), quoting the language of *Danti v. Lewis,* 312 F.2d 345, 348 (D.C. Cir. 1962):

"[W]hether the Trustees have acted arbitrarily, capriciously, or in bad faith; that is, is the decision of the Trustees supported by substantial evidence . . . ."

The court of appeals in its certification has posed a two-faceted problem in respect to the standard of review:

---

[1] 29 U.S.C. sec. 1132(a)(1)(B):

"(a) A civil action may be brought—

"(1) by a participant or beneficiary—

"(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

29 U.S.C. sec. 1132(e)(1):

"(e)(1) Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section."

29 U.S.C. sec. 1132(g)(1):

"(g) Attorney's fees and costs; . . .

"(1) In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

One, given the articulation of the standard of review as arbitrary and capricious, how is such standard to be measured—does the standard have the same meaning and requirements as that of the state arbitrary and capricious standard or is a special federal meaning or interpretation to be attached to that standard of review; and, two, is it appropriate to interpret "arbitrary and capricious" in the manner that is applied to the review of federal administrative agencies—several states have done so in ERISA cases—or is there a unique federal test of what is arbitrary and capricious that is applicable in the ERISA cases before us.

Additionally, the court of appeals asks this court to determine the "nature" of the civil action that may be brought in the state courts. This portion of the court of appeals' certification we understand to be concerned with the procedure to be employed or the remedies afforded in actions in the state court. Are they actions at equity or at law? May money damages or awards be adjudged in state courts or are the powers of the state courts under the federal law only equitable in nature, *i.e.*, can a state court merely set aside the trustees' action for caprice or arbitrariness and order remand for further action or may it award benefits for which the record demonstrates an entitlement under the plan?

The facts of the two cases are strikingly similar. In both the *Evans* and the *Olson* cases, the plaintiff is an employee or the dependent of an employee of the Oshkosh public schools and is covered by a group health insurance plan which is subject to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. sec. 1001 et seq. The same plan is involved in both cases and is administered by the Wisconsin Education Association Insurance Trust. The plan provides coverage for "necessary surgical procedure[s]" resulting

from "accidental injury, sickness or Pregnancy." The plan excludes "charges . . . which are not medically necessary." The plan provides for an appeal procedure, in conformity with ERISA, under which a beneficiary may appeal the denial of a claim to the board of trustees.

Both plaintiffs underwent gastric bypass surgery and submitted claims to the Trust to cover the expenses of the surgery. On August 4, 1980, the Trust's acting claims manager circulated a memo to claims adjusters, supervisors, auditors, and the underwriter, outlining guidelines for benefit determinations in cases of gastric bypass surgery. These guidelines were described by the claims manager as "Trust internal guidelines" and "Claims Department internal guidelines." They were not incorporated into the plan as benefit plan amendments. The memorandum established five guidelines:

"To qualify for benefits payable for gastric bypass surgery:

"1) There *must* be evidence of a complicating medical problem; such as, heart disease, diabetes, hypertension or arthritis. (The fact that a patient is currently taking medication to control the problem is considered sufficient evidence.)

"2) The participant *should* be 100% over ideal body weight.

"3) The participant *should* have carried this weight for a minimum of five years.

"4) The participant *should* have tried traditional methods of weight loss unsuccessfully.

"5) The participant *must* be considered psychologically a good candidate for surgery."

In addition, the memorandum provided that:

"Any member who does not meet the above qualifications and wishes to apply for benefits will be referred, at our expense, to another physician for a second opinion."

The memorandum also included the following explanation of the guidelines:

"By modifying the guidelines in this manner, we are placing the emphasis on the presence of a complicating medical problem which necessitates the rapid weight loss."

To the extent that the facts which differ, in respect to Evans and Olson, are of any significance, we note them.

Evans, who was "morbidly obese," consulted her personal physician in the spring of 1981 to obtain treatment for anxiety and depression. Her physician suggested glucose tolerance tests and also gastric bypass surgery to correct the obesity. Her physician suggested that she check with her health insurer to determine whether the surgical expenses would be covered. She checked with the W.E.A. Trust, was informed of the guidelines, communicated these to her physician, who, according to Evans, told her that she would be covered. Her physician never specifically wrote the Trust to find out whether coverage was authorized. He did, however, send the Trust a copy of his letter to the surgeon, Dr. Hardie, which stated that, from the standpoint of her diabetes, he recommended she have the bypass surgery. A pre-operation examination by Dr. Hardie resulted in a notation of *"secondary* diabetes mellitus" and *"Secondary* hypertension." (Emphasis supplied.) Dr. Hardie performed the bypass surgery on Evans on June 10, 1981. It should be recalled that the "guidelines" had been adopted as an *internal* administrative tool on August 4, 1980.

Following the surgery, a claim for benefits, together with pre-operative and operative reports, were submitted to the Trust. Benefits were denied after the Trust received the opinion of its physician consultant, Dr. Armstrong. He appraised the claim only on the basis of documents submitted to him. He stated:

"I don't believe medical necessity for surgical treatment has been demonstrated. Elective surgery for

obesity not covered. No mention of any diabetes or hypertension sufficient to require surgical treatment."

Further correspondence resulted in a report from Dr. Hardie that the obesity had resulted in adult-onset diabetes and secondary hypertension. He referred to these illnesses as "medical complications of her obesity."

Inexplicably, in the face of that report of Dr. Hardie, the claims manager of the Trust again denied coverage because:

"None of the information presented indicates that you had any complicating medical problems that required surgical intervention in the form of gastric bypass surgery . . . (Dr. Hardie has made no mention of the severity of the diabetes or hypertension which would have warranted surgical intervention.)"

Further correspondence, supplemental information, and an appearance before the trustees themselves ensued.

The basis for not paying the benefits is stated in a denial-of-claim letter of the trustees after the appeal procedure. That letter, dated November 4, 1981, in part stated:

"There is no coverage for surgery that is elective in nature, that is, surgery not required for medical purposes. Because not everyone who is overweight would need such surgery, the benefit determination is based on the medical complications warranting the surgery. None of the information received to date indicates that you had any complicating medical problems that required surgical intervention in the form of a gastric bypass surgery."

It is clear, then, that the Trust concluded that gastric bypass surgery would be covered only where the obesity was the cause of other significant illnesses. Those illnesses had to be manifestations of complications secondary to the obesity. By some reasoning not made

apparent in the record, the Trust, following the rationale frequently and repeatedly stated in the memoranda of its consultant, Dr. Armstrong, concluded that, even were obesity an illness, coverage for surgery to correct or alleviate that illnss was not afforded. The obesity had to be the cause or at least an aggravating factor of a secondary illness or, to put the Trusts' rationale another way, the secondary illness was required to be a complication of the morbid obesity.

That this is the reasoning relied upon by the Trust is demonstrated by the internal memorandum of consultant Dr. Armstrong early in August 1981. Dr. Armstrong stated:

"I believe that the surgery is elective and prophylactic and not for treatment of an illness other than the obesity. I don't think that the blood pressure and diabetes problems that are mentioned were significant enough to necessitate the surgery. Neith[er] condition required any specific treatment. The surgery may have been a reasonable elective procedure for treatment of obesity, but I don't believe this is covered under the provisions of the insurance."

Thus, Dr. Armstrong recognized that obesity was an illness and that the surgery might well have been appropriate for the treatment of that illness.

No question was ever raised in respect to either the degree or duration of Evans' obesity. The only factor used in denying her benefits was that the secondary illnesses, diabetes and hypertension, were not severe enough to warrant surgery. Thus, denial was predicated, not upon the plan—the contract of insurance agreed upon and applicable to the parties—but upon guidelines which were promulgated internally for the administrative use of the claims personnel of the Trust. Only in the guidelines was there any language that would lead to the conclusion that an illness such as morbid obesity

was not to be treated by surgery unless other significant illnesses secondary to it resulted. The Trust by its *ipse dixit* decided that obesity *per se,* no matter how severe, in no case was to be treated by surgery.[2]

Thus, the denial of benefits to Evans was because of the trustees' conclusion that her surgery did not conform to the guideline standards. While the guidelines were promulgated prior to Evans' surgery and she was aware of them, they constituted an unauthorized alteration of the plan. This point will be discussed more fully after pointing out the similarities and differences in the claim asserted by Mary Jane Olson.

Mary Jane Olson submitted to gastric bypass surgery on June 26, 1980—several weeks before the so-called guidelines were administratively promulgated and almost one year prior to the Evans surgery. Her referral to Surgeon Hardie by her own physician pointed out that her obesity had been persistent, that she suffered from chronic depression believed to be related to the obesity, and that she had hypertension *secondary* to the obesity.

Thus, there was at least an indication, in respect to Olson, that her depression and hypertension were complications of morbid obesity. That underlying condition of obesity was never challenged by the Trust.

Olson's claim for benefits under the Trust was filed on July 14, 1980. Her claim also was submitted to the Trust's medical consultant, Dr. Armstrong. He advised the Trust that the claimant fulfilled the criteria for extreme obesity, but he then went on to evaluate the

---

[2] We note evidence of diabetes and hypertension in the reports of Evans' physician. Reasonable persons might well have concluded that such evidence was sufficient even under the guidelines. We, however, do not follow that approach, for the guidelines were promulgated not as a part of the plan, but as a significant unauthorized alteration of the plan.

claim under the guideline standards that were not a part of the contracted-for plan and, in any event, had not been promulgated until after Olson's surgery. On August 19, 1980, the claims supervisor of the Trust denied the claim, specifically citing as the reason for the denial the inability of Olson to fulfill the requirements of the guidelines.

Further correspondence and internal hearings and appeals resulted in continued denials. The letter of denial dated December 4, 1980, exemplifies the rationale of the denials:

"It was our medical consultant's opinion, based on the information that was submitted, that the surgery was elective as Mrs. Olson did not have any medical problem that required surgical intervention. Our medical consultant therefore recommended that her claim be denied. Please refer to limitation number one (1) of the plan."

Although the Trust at this juncture referred to limitation no. 1, the interpretation of that limitation by Dr. Armstrong was based on guideline no. 1, which was treated as a part of the plan when clearly it was not contractually incorporated therein. As in the case of Evans, denial was made not because of a failure to comply with the basic plan, i.e., the necessary treatment of an illness such as obesity, but, rather, on the belief that, at least in respect to obesity, there would be no right to treatment unless the illness of obesity was also a cause of other significant illnesses.[3]

Hence, each of the claims—that of Evans and that of Olson—was denied because of failure to meet the

---

[3] While an argument could be made that, even under the guidelines, there was entitlement to benefits because there was evidence that the depression and hypertension were the resultant complications of morbid obesity, we do not find it necessary to address that question, which is essentially a medical one, because it is clear that the Trust abused its discretion as a matter of law.

guideline standards. Separate actions were brought by Evans and Olson, each retaining different counsel in separate branches of the circuit court for Winnebago county. Each action resulted in summary judgment for the plaintiff on the ground that the record demonstrated that the trustees' decision was the product of the abuse of discretion.

While abuse of discretion is a proper standard for the review of a multitude of discretionary actions and is usually defined in this state in accordance with the formulation of *McCleary v. State,* 49 Wis. 2d 263, 182 N.W.2d 512 (1971), here the law to be applied is the federal law. Moreover, we are not, in ERISA cases of this type, reviewing either a governmental administrative agency or the discretionary action of a trial court. Rather, we review the conduct of a private insurance trust organized pursuant to federal law whose conduct is to be reviewed by standards set by federal law.

Although 29 U.S.C. sec. 1132 does not specify the law to be applied by either federal or state courts reviewing trustees' decisions, the legislative history of ERISA clarifies that state courts as well as federal courts are to apply federal law in cases arising under 29 U.S.C. sec. 1132(a)(1)(B):

"However, with respect to suits to enforce benefit rights under the plan or to recover benefits under the plan which do not involve application of the title I provisions [relating to disclosure and fiduciary standards], they may be brought not only in U.S. district courts but also in State courts of competent jurisdiction. *All such actions in Federal or State courts are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor-Management Relations Act of 1947."* H.R. Conf. Rep. No. 1280, 93rd Cong. 2d Sess., reprinted in

1974 U.S. Code Cong. & Ad. News 5038, 5107. (Emphasis supplied.)

In *Tully v. Fred Olson Motor Service Co.*, 27 Wis. 2d 476, 485, 134 N.W.2d 393 (1965), we recognized that the law to be applied under sec. 301 of the Labor-Management Relations Act was federal law. The guidance offered by the legislative history of ERISA and the rationale of *Tully* dictate that federal law be applied in the instant cases in reviewing the actions of trustees under ERISA.

Federal courts have uniformly held that the standard of review of trustees' benefit determinations under ERISA is that the trustees' decision is to be overturned only if it is arbitrary and capricious.[4] Two seventh circuit cases have provided helpful focus to the meaning of an "arbitrary and capricious" standard of review by their phrasing of the standard: The reviewing court must uphold the trustees' decision unless it was "arbitrary and capricious *in light of the language of the Plan.*" *Wardle v. Central States, Southeast and Southwest Areas Pension Fund*, 627 F.2d 820, 823–24 (7th

[4] *Griffis v. Delta Family-Care Disability and Survivorship Plan*, 723 F.2d 822 (11th Cir. 1984), *cert denied*, —— U.S. —— (1984); *Wolfe v. J.C. Penney Co., Inc.*, 710 F.2d 388 (7th Cir. 1983); *Miles v. New York State Teamsters Conference Pension and Retirement Fund*, 698 F.2d 593 (2d Cir. 1983), *cert. denied*, —— U.S. —— (1984); *Wardle v. Central States, Southeast and Southwest Areas Pension Fund*, 627 F.2d 820 (7th Cir. 1980), *cert. denied*, 449 U.S. 1112 (1981); *Bayles v. Central States, Southeast and Southwest Areas Pension Fund*, 602 F.2d 97 (5th Cir. 1979); *Reiherzer v. Shannon*, 581 F.2d 1266 (7th Cir. 1978); *Brown v. Retirement Committee of Briggs & Stratton Retirement Plan*, 575 F. Supp. 1073 (E.D. Wis. 1983). *See Wolfe*, 710 F.2d at 393 n. 8, for cases in the 1st, 2nd, 3rd, 4th, 5th, 7th, 8th, 9th, 10th, and 11th circuits following this standard of review.

Cir. 1980) ; *Reiherzer v. Shannon,* 581 F.2d 1266, 1272 (7th Cir. 1978). (Emphasis supplied.)

*Miles v. New York State Teamsters Conference, etc.,* 698 F.2d 593 (2d Cir. 1983), provides a statement of the arbitrary and capricious standard of review that is particularly applicable to the present cases. That court explained what kinds of acts by trustees may be found to be arbitrary and capricious:

"Where the trustees of a plan [under ERISA] impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *Miles,* 698 F.2d at 599.

The parties to these two actions do not dispute that "arbitrary and capricious" is the appropriate standard of review. They do disagree, however, on its application in their particular cases. The parties all use an articulation of this standard which refers to "substantial evidence":

" '. . . whether the Trustees have acted arbitrarily, capriciously, or in bad faith; that is, in the decision of the Trustees supported by substantial evidence . . . .' " *Wardle,* 627 F.2d at 824, quoting *Danti v. Lewis,* 312 F.2d 345, 348 (D.C. Cir. 1962).

This statement of the arbitrary and capricious standard of review seems less helpful in cases of trustees' interpretations of the language of benefit plans than do the interpretations of "arbitrary and capricious" in *Miles, Wardle,* and *Reiherzer* discussed above.

Because what we see in these cases is an attempt to impose a standard for payment of benefits that is not required by the basic plan, but rather is imposed by

an administrative gloss designed primarily for the convenience of the claims agents and administrators of the Trust, we conclude that the problem is not an evidentiary one in this case, but is more akin to abuse of discretion as a matter of law under Wisconsin decisions. *See, State v. Hutnik*, 39 Wis. 2d 754, 763, 159 N.W.2d 733 (1968). Here we need not look to the quantum of evidence. We need only to look to the yardstick applied by the trustees. If this yardstick—the guidelines—imposed a standard not required by the provisions of the plan or not consistent with its plain words, any decision based thereon constitutes an abuse of discretion under the statement of the federal law enunciated in *Miles, Wardle,* and *Reiherzer, supra.*

We conclude that the use of the guidelines resulted in decisions that were arbitrary and capricious. The benefit determinations in these cases required the trustees to interpret the language of the plan providing coverage for "necessary surgical procedure[s]" undergone as a result of "sickness" and excluding surgery which is "not medically necessary." The trustees' interpretation of this language, as dictated by the guidelines and as shown in their letters of denial to the claimants, was that gastric bypass surgery is medically necessary only if the claimant has a serious medical problem other than obesity, which medical problem in itself requires surgical intervention to precipitate weight loss. The question is whether the trustees' requirement of documentation of a serious complicating medical condition, in addition to and other than morbid obesity, requiring surgical intervention is "arbitrary and capricious in light of the language of the Plan." *See, Wardle,* 627 F.2d at 824; *Reiherzer,* 581 F.2d at 1272.

In *Reiherzer,* the seventh circuit identified three reasons why the trustees' interpretation of terms in a pension plan was arbitrary and capricious. 581 F.2d

at 1273. First, the plan did not expressly exclude the plaintiff's status from coverage. In light of the statutory requirement for written eligibility requirements, the court found that the absence of specific exclusions in the plan strongly indicated that the trustees' interpretation, excluding the plaintiff's status, was arbitrary and capricious. *Id.* Second, the court found the trustees' decision to be inherently inconsistent because the trustees determined the plaintiff was "self-employed" after 1959 but not before, although nothing about the nature of his employment changed in 1959. The court observed that inherently inconsistent decisions have been held to inddicate arbitrary action. *Id.* Third, the trustees failed to introduce evidence at the trial showing that their interpretation of the plan had been consistently maintained. The court concluded that the ability of the trustees to "blow hot or cold on the definition . . . under the Plan demonstrates the arbitrariness of their denial . . . ." 581 F.2d at 1274.

These three indices of an arbitrary interpretation of the terms of a benefit plan indicate that the W.E.A. Insurance Trust's interpretation of its surgical coverage was arbitrary. First, as in the *Reiherzer* plan, the W.E.A. group health benefits plan did not explicitly exclude gastric bypass surgery from coverage. As noted above, the benefit plan covered "necessary surgical procedure" undergone as a result of "sickness"; it excluded surgery which is "not medically necessary." "Sickness" is defined in Black's Law Dictionary (rev. 4th ed.) to include "any morbid condition of the body . . . which . . . hinders or prevents the organs from normally discharging their several functions." In light of this definition, it would seem that "morbid obesity" that produces even a small dysfunction in the organs that control blood pressure and glucose tolerance (among oth-

er functions) should qualify as a "sickness" under the plan. Surgery should then be covered under the plan so long as it is medically necessary to treat the *obesity*. Thus, morbid obesity is sickness. We need not then look to the extent of consequent dysfunction as the guidelines would indicate. The guidelines relied on by the trustees in these two cases, however, required that the surgery be medically necessary to treat some *other* "complicating medical problem." Under the trustees' interpretation, gastric bypass surgery for the treatment of serious, morbid obesity is never covered by the plan. Because the written plan does not say that there is no coverage for this surgical treatment of obesity, it is arbitrary for the trustees to limit the plan's coverage by interpretation rather than by amendment following proper notice to the participants.[5]

Second, the W.E.A. Insurance trustees' interpretation of "medically necessary" surgery in respect to gastric bypass surgery is, if not "inherently inconsistent," at least difficult to understand. According to the trustees' interpretation, gastric bypass surgery to treat diabetes would be covered if no other diabetes treatment were feasible, yet gastric bypass surgery to treat morbid obesity would not be covered, even when no other treatment is feasible. It is not at all clear why the trustees refuse to judge the medical necessity of the surgery against the severity of the obesity, which, by definition, is a sickness.

Third, the W.E.A. trustees, like the trustees in *Reiherzer*, failed to present evidence that their interpretation of the terms of the plan was consistently maintained.

---

[5] The benefit plan includes a procedure for making changes by amendment. The benefit certificates issued to the plaintiffs in the present cases reveal that a number of amendments to the coverage have been made. It is undisputed that the guidelines were not adopted in conformity with the procedures for amending the plan.

Under *Reiherzer*, this evidence was assumed to be admissible and the burden is the trustees to produce it. Hence, the apparent absence of such evidence in these cases, as in *Reiherzer*, suggests arbitrary action on the part of the trustees.[6] Because the inconsistency of conduct by the Trust was not clearly posed, we do not have occasion in these cases to address the *Reiherzer* language on burden of proof in this respect.

Based on the indices of arbitrary action outlined by the *Reiherzer* court, we conclude that the W.E.A. Insurance Trust's interpretation of the terms of its plan using the guidelines is arbitrary and capricious.

The language of the second circuit in *Miles*, 698 F.2d at 599, also supports this conclusion. As discussed above, the *Miles* court noted that trustees' actions may be arbitrary and capricious where the trustees "impose a standard not required by the plan's provisions." The W.E.A. Insurance Trust's insistence on a serious complicating medical problem in addition to morbid obesity is just such a standard and, for that reason, arbitrary.

We accordingly conclude, utilizing standards of review established by federal law and specifically applicable to the review of decisions of trusts organized pursuant to the legislative mandate of ERISA, that the decision of the trustees of the W.E.A. Insurance Trust was arbitrary and capricious.

The court of appeals has also asked us to decide the "nature" of the action contemplated by the federal law when the concurrent jurisdiction of the state courts is invoked. We are not convinced that the labelling of the action, *i.e.*, in a manner similar to that employed in common law pleading parlance is either desirable or

---

[6] Evidence of record, gleaned from letters by Dr. Hardie were indicative of this inconsistency. It was his assertion, admittedly not proved in the record, that the Trust in the past, under threat of legal action, had paid for gastric bypass surgery.

necessary. All we believe we properly should do in the instant cases is to describe the nature of the remedy the legislation makes available in state courts pursuant to federal law. 29 U.S.C. sec. 1132(e)(1) makes it clear, if the question were otherwise in doubt, that the jurisdiction conferred upon state courts is for civil actions. Sec. 1132(a)(1)(B) gives multiple remedies to the plan participant or beneficiary in the civil action brought in state court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Here each of the claimants has sought a money judgment to "recover benefits." Sec. 1132(d)(2) states that "Any money judgment under this subchapter against an employee benefit plan shall be enforceable . . . ," and in sec. 1132(e)(1), it is expressly stated that the action is civil in nature. Thus, it is clear that the action which can be brought in the state court is a civil action for money damages. In view of this direct and unequivocal language of the federal statutes, whether the action is equitable or legal because of doubt whether there is a right to a jury trial—a point on which federal courts are divided[7]—is irrelevant in the context of the present cases, where we conclude the question posed is whether the court can order a money judgment for the benefits due. We conclude that it clearly can and is not merely

[7] Federal courts have addressed this issue in the context of demands for jury trials. Although the federal courts appear to be divided on the issue, the majority position seems to be that the action under ERISA, 29 U.S.C. sec. 1132, is equitable. *See, Calamia v. Spivey,* 632 F.2d 1235 (5th Cir. 1980) (denying right to jury trial) ; *Wardle, supra* (denying right to jury trial) ; compare, *Stamps v. Michigan Teamsters Joint Council No. 43,* 431 F. Supp. 745 (E.D. Mich. S.D. 1977). The label attached is not of great importance. The question is what remedy may an aggrieved person obtain in a court action.

limited to setting aside the arbitrary and capricious decision and remanding for further consideration.

*Reiherzer v. Shannon,* 581 F.2d 1266 (7th Cir. 1978), exemplifies a situation where the district court ordered a money judgment against trustees who had originally refused to pay benefits. The seventh circuit, supporting the position of the district court, affirmed the finding that the denial of benefits was arbitrary and affirmed the money judgment of the district court.

We conclude that, irrespective of what label might be attached to the statutory action, in cases where the facts and the law are found to be clear upon review, a money judgment may be entered and a remand is not necessary. While a remand might well be necessary where arbitrariness and caprice were the result of some aspect of the trustees' decisional process (*see, Brown v. Retirement Committee of the Briggs & Stratton Retirement Plan,* 575 F. Supp. 1073 (E.D. Wis. 1973)), here the question was the interpretation of the language of the plan—specifically, the utilization of guidelines which clearly and extra-legally altered the agreement of the parties. Absent the guidelines, we conclude, upon our review of the record, there was no challenge to be made to the necessity of the surgery, under the plain language of the plan, nor was there any challenge posed to the amount of benefits due either Evans or Olson. Counsel for the trustees at oral argument specifically acknowledged that no problem or question existed in respect to the amount of either claim if coverage under the plan were established.

We thus conclude that the nature of the statutory civil action permits recovery of a money judgment in court and, in the circumstances of this case, remand to the trustees is neither appropriate nor required.

In both the Evans and Olson cases, the trial judges awarded attorney's fees of $1,000. Counsel in each case had the opportunity in the circuit court to file briefs on the question. Both trial judges were informed by briefs of the federally approved standard found in case law for the discretionary award of attorney's fees. 29 U.S.C. sec. 1132(g)(1) provides, ". . . the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." Because the trial judges in each case considered the appropriate cases[8] and factors in light of a specific statutory authorization for attorney's fees, we conclude that the award of attorney's fees in each case was appropriate. We affirm each award of attorney's fees.

While there is no specific statutory provision for an award of prejudgment interest under ERISA, at least two federal courts have awarded prejudgment interest. *Baeten v. Van Ess,* 474 F. Supp. 1324 (E.D. Wis. 1979); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208 (8th Cir. 1981). In *Dependahl,* the court of appeals affirmed a district court order for prejudgment interest in a case of an ERISA violation. That court concluded that the question of whether interest is to be allowed is a question of federal law because the cause of action is federal. Because there is no explicit statutory provision therefor in ERISA, the *Dependahl* court looked to cases decided under the Fair Labor Standards Act. Relying on the reasoning of *Hodgson v. American Can Co.,* 440 F.2d 916 (8th Cir. 1971), the court decided that prejudgment interest was necessary to provide equitable relief. Although the defendant Trust in the present cases

---

[8] *See, Sapper v. Lenco Blade, Inc.,* 704 F.2d 1069, 1073 (9th Cir. 1983); *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir. 1980).

tries to distinguish *Dependahl* as involving a different kind of ERISA violation, a more important distinction is that the section granting concurrent jurisdiction to state and federal courts (29 U.S.C. sec. 1132(e)(1)) refers only to actions brought under subsection (a)(1)(B); the subsection permitting civil actions "to obtain . . . appropriate equitable relief" is (a)(3), for which there is exclusive federal court jurisdiction. Nonetheless, there is nothing in sec. 1132(a)(1)(B) that appears to preclude an award of prejudgment interest. Moreover, we are not inclined to interpret "equitable" in a technical sense. The tenor of the act would appear to afford an equal remedy whether the action was brought in a state or federal court and irrespective of whether the trust or a claimant prevails. Here, the question of the guidelines aside, the right to the benefits and the amount due were, under the facts and posture of these cases, uncontested and the sum due fully liquidated. Hence, under federal law utilized by the eighth circuit and the United States District Court for the Eastern District of Wisconsin, which we follow in these cases, prejudgment interest is payable. We affirm the circuit courts in this respect also.

We affirm the judgment of the circuit court for Winnebago county in the case of Jeff Evans and Demaris Evans v. W.E.A. Insurance Trust.

We affirm the judgment of the circuit court for Winnebago county in the case of John A. Olson and Mary Jane Olson v. W.E.A. Insurance Trust.

*By the Court.*—Judgments affirmed.